Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DANIEL GUGGENHEIM; SUSAN
GUGGENHEIM; MAUREEN H. PIERCE,
       *Plaintiffs-Appellants,*

v.

CITY OF GOLETA, a municipal
corporation,

       *Defendant-Appellee.*

No. 06-56306

D.C. No.
CV-02-02478-FMC

OPINION

Appeal from the United States District Court
for the Central District of California
Florence Marie Cooper, District Judge, Presiding

Argued and Submitted
April 7, 2008—Pasadena, California

Filed September 28, 2009

Before: Alfred T. Goodwin, Andrew J. Kleinfeld, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee;
Dissent by Judge Kleinfeld

**COUNSEL**

Mark D. Alpert, Robert S. Coldren (argued), and C. William Dahlin, Santa Ana, California, for the plaintiffs-appellants.

Julie Hayward Biggs and Amy E. Morgan (argued), Los Angeles, California, for defendant-appellee.

**OPINION**

BYBEE, Circuit Judge:

   Daniel Guggenheim and others bring a facial challenge to the City of Goleta's mobile home rent control ordinance.

Guggenheim argues that the ordinance, which effects a transfer of nearly 90 percent of the property value from mobile home park owners to mobile home tenants, constitutes a regulatory taking under *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). We have fielded such challenges before, but have never reached the merits of the takings claim. *See, e.g.*, *Equity Lifestyle Props., Inc. v. County of San Luis Obispo* ("*Equity Lifestyle*"), 548 F.3d 1184, 1190 n.11 (9th Cir. 2008); *Carson Harbor Vill. Ltd., v. City of Carson*, 37 F.3d 468, 475-77 (9th Cir. 1994), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc); *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 686-89 (9th Cir. 1993); *Sierra Lake Reserve v. City of Rocklin*, 938 F.2d 951, 955 (9th Cir. 1991), *vacated*, 506 U.S. 802 (1992).

To determine whether a taking has occurred we must decide several issues. We must first determine whether the mobile home park owners have standing to bring this case. Additionally, we must consider whether this case is ripe under *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985). If so, then we must determine whether the city ordinance constitutes a regulatory taking under *Penn Central*. We also address challenges to the ordinance under the Due Process and Equal Protection Clauses.

The district court did not address either the standing or ripeness questions due to the unusual procedural history of the case, but implicitly found the case was properly brought. The district court found that no taking had occurred. For the reasons explained below, we agree with the district court that this case is properly brought and ripe for decision, but we disagree with the district court on the merits of the takings claim. Because we find that a taking has occurred, we reverse and remand to the district court to determine what compensation is due. We affirm the district court's judgment on the due process and equal protection claims.

## I

## A

The Takings Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, *see Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 236 (1897), provides that "private property [shall not] be taken for public use, without just compensation." The Takings Clause "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 314 (1987). The Takings Clause was drafted so as "not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *Id.* at 315. The Takings Clause " 'bar[s] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).

To determine whether a mobile-home rent control ordinance constitutes a taking under the Constitution, we must first understand some unique characteristics of mobile homes. "The fact that these homes can be moved does not mean that they do move." JOHN STEINBECK, TRAVELS WITH CHARLEY: IN SEARCH OF AMERICA 96 (Penguin Books 1986) (1962). As described by the Supreme Court:

> The term "mobile home" is somewhat misleading. Mobile homes are largely immobile as a practical matter, because the cost of moving one is often a significant fraction of the value of the mobile home itself. They are generally placed permanently in parks; once in place, only about 1 in every 100 mobile homes is ever moved . . . . A mobile home

> owner typically rents a plot of land, called a "pad," from the owner of a mobile home park. The park owner provides private roads within the park, common facilities such as washing machines or a swimming pool, and often utilities. The mobile home owner often invests in site-specific improvements such as a driveway, steps, walkways, porches, or landscaping. When the mobile home owner wishes to move, the mobile home is usually sold in place, and the purchaser continues to rent the pad on which the mobile home is located.

*Yee v. City of Escondido*, 503 U.S. 519, 523 (1992) (citation omitted).

The County of Santa Barbara, California (the "County"), first enacted its Rent Control Ordinance (the "RCO") in 1979, and amended it in 1987. In 2002, the City of Goleta incorporated within the County. As required by California law, the new City of Goleta immediately adopted by reference the County's code in its entirety, including the RCO, as its provisional new code. *See* CAL. GOV'T CODE § 57376 (2008); City of Goleta Ordinance No. 02-01. About two months later, the City re-adopted by reference most provisions of the County code, including the RCO, as permanent city ordinances. City of Goleta Ordinance No. 02-17.

The statement of "Purpose" in the RCO has remained unchanged since the RCO was first passed by the County in 1979. The purpose was to prevent mobile home park owners from charging exorbitant rents to exploit local housing shortages and the fact that mobile home owners could not easily move their homes:

> A growing shortage of housing units resulting in a critically low vacancy rate and rapidly rising and exorbitant rents exploiting this shortage constitutes serious housing problems affecting a substantial por-

tion of those Santa Barbara County residents who reside in rental housing . . . . Especially acute is the problem of low vacancy rates and rapidly rising and exorbitant rents in mobile home parks in the County of Santa Barbara. Because of such factors and the high cost of moving mobilehomes, . . . the board of supervisors finds and declares it necessary to protect the owners and occupiers of mobilehomes from unreasonable rents while at the same time recognizing the need for mobile home park owners to receive a fair return on their investment and rent increases sufficient to cover their increased costs.

RCO § 11A-1.[1]

The RCO limits any increases in mobile home rents on an annual basis to 75 percent of the increase in the local Consumer Price Index ("CPI"). RCO §§ 11A-5(a)(2), 11A-5(a)(3), 11A-5(g). This increase is referred to as the "automatic increase." Mobile home park owners may also increase the rent by an additional amount to pass through increased operating costs, capital expenses, and capital improvements. This increase is referred to as the "discretionary increase." RCO § 11A-5(f)(1); 11A-6. The RCO sets out an arbitration process by which park owners must work with the mobile home owners and an arbitrator to determine the total amount of the permissible rent increase for each year. RCO §§ 11A-4, 11A-5. The arbitrator must follow a complicated formula to

---

[1]Because the City of Goleta adopted the RCO "by reference," the authoritative source of the RCO is found in the County code. *See* City of Goleta Ordinance No. 02-17 (adopting most provisions of the County code "by reference" and stating that "[w]henever 'County' or 'County of Santa Barbara' is used in the County Code . . . it shall mean the City of Goleta."). A copy of Santa Barbara's current version of the RCO may be found at http://www.bpcnet.com/codes/stbarb/, by clicking on the link titled "Chapter 11 Mobilehomes." The citations in this opinion refer to the RCO as amended in 1987.

determine the amount of any increase in excess of the automatic increase:

(1) First, grant one-half of the automatic increase to management as a just and reasonable return on investment. The arbitrator shall have no discretion to award additional amounts as a just and reasonable return on investment;

(2) Next, grant one-half of the automatic increase to management to cover increased operating costs. The arbitrator shall have no discretion to award less than this amount for operating costs.

(3) Next, add an amount to cover operating costs, if any, in excess of one-half of the automatic increase. The arbitrator shall have discretion to add such amounts as are justified by the evidence and otherwise permitted by this chapter.

(4) Next, add an amount to cover new capital expenses. Where one-half of the automatic increase is more than the actual increase in operating costs for the year then ending, the arbitrator shall offset the difference against any increases for new capital expenses.

(5) Next, add an amount to cover old capital expenses. Where one-half of the automatic increase is more than the actual increase in operating costs for the year then ending, the arbitrator shall offset the difference against any increase for old capital expenses unless such difference has already been used to offset an increase for a new capital expense or another old capital expense . . . .

(6) Finally, add an amount to cover increased costs for capital improvements, if any. The arbitrator shall

> have discretion to add such amount as is justified by
> the evidence and otherwise permitted by this ordi-
> nance.

RCO § 11A-5(I). The RCO also contains a vacancy control
provision, which limits the permissible rent increase to 10
percent when a unit is sold. RCO § 11A-14. In sum, the RCO
mandates that a "just and reasonable return" for the park own-
ers must always be less than or equal to exactly one half of
75 percent of the annual increase of the CPI. The RCO per-
mits park owners to go to arbitration to pass through addi-
tional costs, but such costs must be re-captured without *any*
return on investment. In the event a tenant sells his or her unit,
the park owners are entitled to a one-time rent increase of 10
percent; subsequent increases are capped by the regular for-
mula.

## B

### 1

Appellants Daniel Guggenheim, Susan Guggenheim, and
Maureen H. Pierce (collectively, the "Park Owners") pur-
chased the Ranch Mobile Estates mobile home park ("the
Park") in 1997, at which time the Park was located in an unin-
corporated part of the County. At the time of the purchase,
therefore, the Park was subject to the County's RCO as
amended in 1987. When the City incorporated in 2002, the
Park fell within the new city's jurisdiction. Because the City
adopted the RCO by reference, the Park continued to be sub-
ject to the RCO after the City incorporated.

A month after the City incorporated, the Park Owners
brought suit in federal court, alleging only facial challenges
to the RCO. The Park Owners claimed, *inter alia*, violations
of the Takings Clause, the Due Process Clause, and the Equal
Protection Clause. The Park Owners also raised complex state
law claims, claiming the City failed to follow proper proce-

dures required by the California Government Code when it enacted the RCO. Apparently, the Park Owners initiated the lawsuit in 2002, even though they purchased the Park in 1997, because they claimed the City adopted the RCO without any "hearings or studies or investigations as to whether the County's Ordinance was needed or appropriate for the City." The Park Owners' complaint represented that they "had attempted to meet with the City officials-elect to discuss the City's potential adoption of" the County's RCO, and had "applied to the City for relief from the potential vacancy control restriction in the County Ordinance[,] but it was nevertheless adopted without any change by Defendant City." The Park Owners complained that when it adopted the RCO, "[t]he City failed to review the County Code or make any findings on whether there was a purpose or need" for the RCO in the current real estate market.

The district court stayed the viable federal claims under the *Pullman* doctrine, to permit the resolution of certain complex state law claims that might "moot or narrow the constitutional questions." *San Remo Hotel v. City and County of San Francisco*, 145 F.3d 1095, 1104 (9th Cir. 1998). The parties settled their state law claims after litigating in Santa Barbara Superior Court, and then returned to federal court for a second time.[2]

2

Back in federal court, the Park Owners moved for partial summary judgment. The district court reviewed the undisputed facts and the affidavits and documents proffered by the

---

[2]Of particular relevance to this appeal, the parties stipulated that there was a gap in time when no rent control ordinance was in effect over the Park. This stipulated fact was necessary to support the timeliness of the Park Owners' facial challenges to the RCO. The statute of limitations for a facial takings claim begins to run with the passage of the challenged law. *See Equity Lifestyle*, 548 F.3d at 1193. The supposed "gap in time" clarified that the City's RCO, for purposes of this litigation, was enacted in 2002. Thus, the Park Owners' suit, initiated in 2002, was timely.

parties. The court found that during the time the Park Owners owned the Park, housing costs in the City increased approximately 225 percent. Because of the RCO, the rents charged by the Park Owners did not keep pace with this increase. The below-market rents resulted in the ability of mobile home owners to sell their homes at a significant premium (the transfer premium). The district court found, based on a report provided by the Park Owners, that the transfer premium amounted to, on average, 88 percent of the sale price. "In other words," the district court found, "an average mobile home worth $12,000 would sell for approximately $100,000." The district court found that "the uncontroverted facts . . . establish the existence of a premium," and that even "[t]he City has acknowledged the existence of such a premium."

The district court granted summary judgment on the takings claim in favor of the Park Owners on October 29, 2004. At the time the district court made its determination, the law in the Ninth Circuit was that a government regulation effected a taking if such regulation did not "substantially advance" legitimate state interests. *See, e.g.*, *Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980); *Richardson v. City and County of Honolulu*, 124 F.3d 1150, 1165-66 (9th Cir. 1997) (holding that a condominium rent control ordinance that permits incumbent condominium owners to capitalize the net present value of reduced land rent will not substantially further its goal of creating affordable owner-occupied housing and thus constitutes a taking). The district court found it undisputed that the RCO effected a one-time wealth transfer from the Park Owners to the incumbent tenants, and that the RCO failed to substantially advance its stated purpose of providing affordable housing. The court found, therefore, that the RCO was an unconstitutional regulatory taking and the Park Owners were entitled to just compensation. The City timely appealed.

On May 23, 2005, while the case was on appeal, the Supreme Court decided *Lingle v. Chevron U.S.A. Inc.*, 544

U.S. 528 (2005). *Lingle* repudiated the "substantially advances" theory upon which the Park Owners had prevailed.[3] In light of this development, the parties stipulated to vacate the district court's judgment and return for what would now be their fourth round of litigation before a trial court.

3

After some renewed pre-trial litigation, the district court issued a series of summary judgment rulings in which it found in favor of the City on each of the Park Owners' remaining constitutional claims. On April 5, 2006, the district court denied the Park Owners' motion for partial summary judgment, finding that the Park Owners were not entitled to judgment as a matter of law as to whether the RCO constituted a regulatory taking under *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). The court reviewed both parties' expert reports and found that the evidence as to the economic impact of the regulation was "mixed":

> Although [the Park Owners] have enjoyed a rate of return comparable to other real estate investments, [the Park Owners'] evidence tends to suggest that they would have earned more—perhaps much more —in the absence of the RCO.

The district court also denied the Park Owners' motion for summary judgment on their substantive due process and equal protection claims. The parties continued to prepare for trial— designating experts, agreeing to witness and exhibit lists, and filing motions *in limine*.

---

[3]The Court found that the "substantially advances" theory "prescribes an inquiry in the nature of a due process, not a takings, test, and that it has no proper place in our takings jurisprudence." *Lingle*, 544 U.S. at 540. *See generally Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851, 854-56 (9th Cir. 2007) (discussing *Lingle*'s reasoning and its impact on Takings Clause jurisprudence).

On July 27, 2006, the district court *sua sponte* issued an Order to Show Cause why the court should not, on its own motion, enter summary judgment in favor of the City. On September 6, 2006, after reviewing the parties' responses, the district court entered summary judgment in favor of the City on all of the Park Owners' remaining causes of action. The court stated:

> Because this is a facial challenge to the ordinance in question, the evidence [the Park Owners] seek to present at trial vis[-]a[-]vis their Fifth Amendment [T]akings [C]lause claim is irrelevant. To facially attack the ordinance as an uncompensated "taking," [the Park Owners] must demonstrate that the mere enactment of the ordinance constitutes a taking.

The court then complained that the Park Owners had "impermissibly attempted to convert this action, *de facto*, into an as-applied challenge." The district court did not, however, identify which evidence it found "irrelevant" or "impermissible" in a facial takings claim. The district court also did not make explicit whether it incorporated its April 5 analysis of the Park Owners' *Penn Central* claim into its final judgment or whether it entered final judgment solely on the ground the Park Owners were barred from presenting evidence in a facial challenge. The Park Owners appealed in a timely manner.

## II

This case has already been litigated through three full rounds at the trial level, including one in state court and two in federal court, producing one victory for the Park Owners, one for the City, and one tie (the settlement). Accordingly, it may come as a surprise that before we reach the merits of the Park Owners' appeal, we must consider whether the plaintiffs have standing to bring this case and whether this case is ripe for decision.

A

Under Article III, our power to adjudicate is limited to "cases" and "controversies." U.S. CONST. art. III, § 2, cl. 1. Accordingly, we are not authorized to decide a dispute "merely because a party requests a court of the United States to declare its legal rights, and has couched that request for forms of relief historically associated with courts of law in terms that have a familiar ring to those trained in the legal process." *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982). Rather, we must first determine whether a litigant has "standing" to bring suit in the federal forum for his alleged injury.[4] *See id.* at 471-72.

The Supreme Court has defined standing generally as "the question of . . . whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). We have recognized that a plaintiff must at minimum present a suit with "three elements" in order to satisfy us that this question can be answered affirmatively. *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1121-22 (9th Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). A plaintiff must first "have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotations omitted). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (internal quotation marks and alterations omitted). Finally, "it must be 'likely,' as opposed

---

[4]Although neither party addressed standing, "[b]ecause standing is a necessary element of federal jurisdiction, we raise the issue of standing *sua sponte*." *Carson Harbor Village*, 37 F.3d at 475.

to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Id.* at 561.

There is no question that the latter two elements of the standing inquiry are satisfied by the Park Owners. The Park Owners submitted a comprehensive analysis of the effects of the RCO which demonstrated that the RCO reduced the rents the Park Owners could collect by approximately $10,000 per year. *See infra* n.14. The link between the Park Owners' injury and the RCO is thus not "tenuous" but "fairly traceable" to the City's action. *See Tyler v. Cuomo*, 236 F.3d 1124, 1132-33 (9th Cir. 2000). If we were to determine that the RCO effected a taking, the Park Owners are due compensation for their loss—thus, it is not "merely speculative . . . that the injury will be redressed by a favorable decision." *Id.* at 1133.

**[1]** Nevertheless, we must still determine whether the Park Owners have an "actual injury"—that they have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962). This "actual injury" requirement "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge*, 454 U.S. at 472.

Although in this case there is every indication that the Park Owners (and the City, who never raised the question of standing) believed they had a personal stake in the outcome of the controversy—indeed, both parties litigated the merits of the claim several times over—we have previously denied standing to similar plaintiffs bringing facial takings challenges against rent control ordinances. *See Equity Lifestyle*, 548 F.3d at 1193; *Carson Harbor Village*, 37 F.3d at 475-76. In *Carson*

*Harbor Village*, we held that a mobile home park owner who had purchased the regulated property *after* the allegedly unconstitutional ordinance was passed did not have standing to state a facial takings claim. 37 F.3d at 476. We reasoned that the park owner's claims "necessarily rest on the premise that an interest in property was taken from all mobile home property owners upon the statute's enactment." *Id.* Accordingly, because "[i]n a facial taking, the harm is singular and discrete, occurring *only* at the time the statute is enacted . . . . [b]ecause [the plaintiff] did not own the property when the statutes were enacted and when the alleged facial takings occurred, it has incurred no injury entitling it to assert a facial claim." *Id.* Likewise, in *Equity Lifestyle*, we dismissed a mobile home park owner's facial takings claim because "the injury is treated as having occurred to the previous landowner" who occupied the property at the moment the allegedly offending statute was enacted. 548 F.3d at 1193.

We have also noted, without deciding the issue, that the Supreme Court's opinion in *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001), calls into question the principle that a subsequent property owner does not have standing to assert a facial challenge to a statutory enactment thought to effectuate a taking. *See Equity Lifestyle*, 548 F.3d at 1190 n.11, 1193 n.15. In *Palazzolo*, the Court rejected the notion that only the landowner at the time of the statute's enactment could assert a valid takings claim under *Penn Central*. *See* 533 U.S. at 630 ("[A takings claim] is not barred by the mere fact that title was acquired after the effective date of the state-imposed restriction."). The Court remarked that "[a] law does not become a background principal for subsequent owners by enactment itself." *Id;* s*ee Equity Lifestyle*, 548 F.3d at 1190 n.11. These statements, as we have previously noted, cast doubt on *Carson Harbor Village*'s rationale for denying standing to subsequent purchasers—they indicate that a subsequent purchaser may have a stake in a facial suit against the regulation. *See id.*

**[2]** In this case, however, even if the rule of *Carson Harbor Village* survives *Palazzolo*, the Park Owners satisfy Article III's case or controversy requirements. Although the Park Owners purchased the burdened property in 1997, eighteen years after the County first passed the RCO and ten years after it was amended, the City adopted the RCO in 2002, after the Park Owners were in possession of the Park. Additionally, the parties stipulated that there was some time period between the City's incorporation and the City's adoption of the RCO in which no rent control ordinance was in effect. *See supra* n.2. Thus, assuming that *Carson Harbor Village* is still good law, even though the Park Owners might not have standing to challenge the *County's* use of the RCO, they are precisely the sort of plaintiffs *Carson Harbor Village* envisioned bringing a facial challenge to the *City's* RCO. *See Carson Harbor Village*, 37 F.3d at 476 ("[F]acial [takings] claims necessarily rest on the premise that an interest in property was taken from all mobile home property owners upon the statute's enactment."). We therefore find that the Park Owners have standing to bring their takings claim.

B

**[3]** "[A] takings claim must [also] . . . comply with timeliness requirements. It must be filed neither too early (unripe) nor too late (barred by a statute of limitations)." *Equity Lifestyle*, 548 F.3d at 1190. In *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 185 (1985), the Supreme Court held that a takings claim is not ripe until the property owner has attempted to obtain just compensation for the loss of his or her property through the procedures provided by the state for obtaining such compensation and been denied. *Id.* at 195. *Williamson* also set forth an additional hurdle, applicable only to as-applied challenges: the property owner must have received a "final decision" from the appropriate regulatory entity as to how the challenged law will be applied to the property at issue. *Id.* at 192-93. The latter requirement is not applicable here because

the Park Owners have raised only a facial challenge. "Facial challenges are exempt from the ["final decision"] prong of the *Williamson* ripeness analysis because a facial challenge by its nature does not involve a decision applying the statute or regulation." *Hacienda Valley Mobile Estates v. City of Morgan Hill*, 353 F.3d 651, 655 (9th Cir. 2003) (citation omitted).

The district court found that this case was ripe, although on a slightly different theory. When the Park Owners filed suit in federal district court, they had approached the City of Goleta to ask for relief from the RCO, but had not brought an inverse condemnation suit in a California court. Thus, the Park Owners had failed to satisfy *Williamson*'s first prong, that the property owners exhaust state remedies. The district court found that the Park Owners' facial challenges were ripe nevertheless because of a narrow exception to the *Williamson* requirement. At the time the Park Owners brought this suit, a claim that a law constituted a taking because it did not "substantially advance" the purpose of that law was exempt from the *Williamson* requirement. *See Yee*, 503 U.S. at 533-34. The Court had created the exception for challenges on the "substantially advances" theory because "this allegation does not depend on the extent to which petitioners are deprived of the economic use of their particular pieces of property or the extent to which these particular petitioners are compensated." *Id.* at 534 (citing *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495 (1987)). Thus, the Park Owners were permitted to litigate their claims through federal court; they eventually prevailed on the "substantially advances" theory.

When the Supreme Court repudiated the "substantially advances" theory in *Lingle*, presumably it closed this theory's loophole in the *Williamson* requirements. *See San Remo Hotel, L.P. v. City and County of San Francisco*, 545 U.S. 323, 345-46 & n.25 (2005) (stating that *Williamson* did not reach "substantially advances" claims, but noting that after *Lingle*, such claims were foreclosed). Therefore, once *Lingle*

was decided and the parties stipulated to vacate the first judgment of the district court and return to that court to litigate the Park Owners' remaining claims, the ripeness of these claims was unclear.

After returning to district court, the City failed to raise the issue of ripeness to the district court's attention, and instead proceeded to defend its RCO on the merits. The district court, too, declined to raise the issue of ripeness and proceeded to grant summary judgment in favor of the City on the merits. In the parties' filings on appeal to this court, neither party raised the issue of ripeness. Unsure of whether this case was ripe, and unsure of whether we had a duty to raise the issue ourselves, we asked the parties to discuss ripeness at oral argument. In addition to presenting the legal arguments we discuss below, the parties both represented that the Park Owners had not brought an inverse condemnation action in a California court. *See generally Kavanau v. Santa Monica Rent Control Bd.*, 941 P.2d 851 (Cal. 1997).

1

In order to determine whether the Park Owners's claims are ripe under *Williamson*, and, if so, whether they have satisfied the *Williamson* requirements, we must look closely at *Williamson* and its progeny.

As the Park Owners contended at oral argument, *Williamson* has come under scrutiny since it was decided. Counsel for the Park Owners accused *Williamson* of having effectively "closed the federal courthouse doors" to litigants seeking to vindicate an important right embedded in the Fifth Amendment of the United States Constitution. He was not the first to level this accusation. In fact, the Supreme Court has already acknowledged that the practical effect of *Williamson* is that plaintiffs alleging violations of the Takings Clause will almost never have the opportunity to litigate their federal claims in federal court. *See San Remo Hotel*, 545 U.S. at

337-41, 344-48. *Williamson* requires plaintiffs to go first to state court, where they are likely to generate a ruling on the merits of their takings claim from the state court that in turn will have preclusive effect should they opt to return to federal court. *Id.*

Chief Justice Rehnquist, joined by three members of the Court, wrote specially in *San Remo Hotel* to explain why he believed *Williamson* may have been wrongly decided. *See id.* at 348, 352 (Rehnquist, C.J., concurring in the judgment) ("I joined the opinion of the Court in *Williamson County*. But further reflection and experience lead me to think that the justifications for its state-litigation requirement are suspect, while its impact on takings plaintiffs is dramatic."). The concurring Justices stated:

> *Williamson County* all but guarantees that claimants will be unable to utilize the federal courts to enforce the Fifth Amendment's just compensation guarantee. The basic principle that state courts are competent to enforce federal rights and to adjudicate federal takings claims is sound, and would apply to any number of federal claims. But that principle does not explain why federal takings claims in particular should be singled out to be confined to state court, in the absence of any asserted justification or congressional directive.

*Id.* at 351 (citations omitted). Nevertheless, unless and until the Court decides to reconsider this issue, *Williamson* is the law by which we are bound.[5]

---

[5]"We are free to muse, however," *Clement v. City of Glendale*, 518 F.3d 1090, 1093 n.4 (9th Cir. 2008), as to an additional reason why *Williamson* may be incorrect. *See San Remo Hotel*, 545 U.S. at 352 (Rehnquist, C.J., concurring in the judgment) (suggesting that it might be appropriate to revisit this issue if the "court below has addressed the correctness of *Williamson*"). *Williamson* reasoned that "[t]he Fifth Amendment does not

2

Although the Court has so far declined to reconsider *Williamson*, it has with some frequency continued to clarify and modify the doctrine. These modifications provide the framework by which we must determine the application of *Williamson* to the unusual case before us.

Most importantly, the Court has explicitly held that the *Williamson* requirements are merely prudential requirements. In *Lucas v. South Carolina Coastal Council*, the Court stated that the *Williamson* requirements were prudential: "Lucas has properly alleged Article III injury in fact in this case," and the fact that he had not satisfied *Williamson* "goes only to the prudential 'ripeness' of Lucas's challenge, and for the reasons discussed we do not think it prudent to apply that prudential requirement here." 505 U.S. 1003, 1012-13 (1992). Similarly, in *Suitum v. Tahoe Regional Planning Agency*, the Court distinguished constitutional ripeness under Article III and prudential ripeness, and stated that *Williamson* ripeness is grounded exclusively in prudential considerations. 520 U.S. 725, 733-34 & n.7 (1997) (stating that it was undisputed that the case "presents a genuine 'case or controversy' sufficient

proscribe the taking of property; it proscribes taking without just compensation," and therefore, until the property owner has actually sought and been denied just compensation in the state court, the Fifth Amendment has not been violated. *Williamson*, 473 U.S. at 194. With this analysis, the Court read an exhaustion requirement into the definition of the constitutional injury. With all due respect, we do not think the Constitution requires this result. "[P]rivate property [is] taken for public use, without just compensation," U.S. CONST. amend. V, at the very moment the government takes the private property and fails to compensate the property owner. The property owner who files an unsuccessful inverse condemnation claim in state court and then somehow manages to have the claim heard in federal court is owed just compensation from the date of the government's action taking the property without compensating the owner, not the date on which the property owner received the final decision in state court denying the taking claim.

to satisfy Article III," and considering only whether the plaintiff's case satisfied the prudential requirements). The Court itself called the *Williamson* requirements "prudential ripeness principles." *Id.*; *see also San Remo Hotel*, 545 U.S. at 349 (Rehnquist, C.J., concurring in the judgment) (noting that the Court may have purported to "divin[e]" the *Williamson* requirements from the text of the Fifth Amendment but later had held them to be merely prudential).

The Court's clarification that *Williamson* created mere "prudential requirements" is crucial to our analysis for two reasons. First, if *Williamson* were grounded in Article III ripeness, we would be required to raise the issue *sua sponte* even though neither party raised it. *See Poland v. Stewart*, 117 F.3d 1094, 1104 (9th Cir. 1997) ("An appellate court has a duty to consider *sua sponte* whether an issue is ripe for review, in order to ensure that proper subject matter jurisdiction exists to hear the case."). Because *Williamson* has been held to be merely a set of prudential, exhaustion-type requirements, although we asked the parties for their views, we were not obligated to raise the issue. *Compare Day v. McDonough*, 547 U.S. 198, 202, 205, 209-10 (2006) (holding that AEDPA's statute of limitations was akin to an exhaustion requirement, that it could be waived by the state, and that "district courts are permitted, but not obligated, to consider, *sua sponte*" the issue), *with John R. Sand & Gravel Co. v. United States*, 128 S. Ct. 750, 752-54, (2008) (holding that the statute of limitations for cases in the United States Court of Federal Claims, 28 U.S.C. § 2501, is akin to a jurisdictional requirement, and therefore the Court of Appeals for the Federal Circuit was obligated to raise the timeliness issue despite the government's waiver of it). As *Lucas* clearly illustrates, some takings cases will have undisputably satisfied Article III jurisdictional requirements but will have failed to satisfy the *Williamson* prudential requirements. The Court has held that where constitutional ripeness requirements have otherwise been met, a court may consider whether to excuse the failure to satisfy prudential requirements without concern of exceed-

ing its Article III jurisdiction. *Lucas*, 505 U.S. at 1012-14 (citing practical concerns to justify reaching the merits).

**[4]** Second, because *Williamson* exhaustion is prudential only, the requirement may be waived or forfeited. *See Day*, 547 U.S. at 202, 205 (holding that the state may waive objections to AEDPA's statute of limitations, which, like an exhaustion requirement, is nonjurisdictional); *Queen of Angels/Hollywood Presbyterian Med. Ctr. v. Shalala*, 65 F.3d 1472, 1482 (9th Cir. 1995) (holding that "Medicare's administrative exhaustion requirements are jurisdictional in nature" but may be waived by the Secretary expressly or "involuntarily, through a mistake or omission"); *LaDuke v. Nelson*, 762 F.2d 1318, 1323 & n.4 (9th Cir. 1985) (distinguishing between Article III and prudential standing requirements, noting that one prudential requirement was waived by the plaintiff, and finding the requirement did not bar the suit because the underlying justifications for that prudential limitation were absent); *see also Zhong v. U.S. Dep't of Justice*, 480 F.3d 104, 117-25 (2d Cir. 2007) (holding that issue exhaustion in the context of immigration petitions is not "truly 'jurisdictional' in the Article III sense" but rather a prudential administrative exhaustion requirement, and therefore that the defense may be waived and that the court has discretion to review issues not exhausted where it deems the underlying prudential concerns have been satisfied (citation omitted)). Here, in its post-*Lingle* filings before the district court and its filings on appeal to this court, the City of Goleta forfeited the claim that this case was not ripe for review by failing to raise it.

We note that there is tension in our decisions on this point. As we recently observed, "[a]lthough the Supreme Court has described takings claims ripeness as addressing prudential rather than Article III considerations . . . our Circuit has analyzed takings claim ripeness as raising both prudential and Article III considerations." *McClung v. City of Sumner*, 548 F.3d 1219, 1224 (9th Cir. 2008) (citing cases). In particular,

there is tension between language in three of our decisions. In *Hacienda Valley Mobile Estates v. Morgan Hill*, 353 F.3d 651 (9th Cir. 2003), we concluded that "[b]ecause . . . Hacienda's claim is not ripe, we affirm the district court's dismissal for lack of subject matter jurisdiction." *Id.* at 661. In that case, we did not otherwise discuss whether *Williamson* embraced both jurisdictional and prudential requirements, nor did we discuss the impact on *Williamson* of *Palazzolo*, *Suitum*, or *Lucas*. By contrast, in *Richardson v. City & County of Honolulu*, 124 F.3d 1150 (9th Cir. 1997), we recited that "[i]f a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed," and we then determined that the landowners' takings claim was "not ripe" and "premature." *Id.* at 1160, 1161-62 (quotation marks and citation omitted), 1162. Although the claim was not ripe under *Williamson*, we reached the merits anyway and upheld the constitutionality of the ordinance. *Id.* at 1166. We thus treated the ripeness inquiry as prudential only. In our latest effort in this area, *McClung v. City of Sumner*, we noted the conflict in our cases and then treated the jurisdictional concerns as an aspect of Article III and the prudential concerns as the sole inquiry under *Williamson*. 548 F.3d at 1224 ("[W]e do not resolve whether this claim is ripe under the standards articulated in *Williamson*, and instead assume without deciding that the takings claim is ripe in order to address the merits of the appeal.").[6]

**[5]** In light of the Supreme Court's unmistakable pronouncements, we think that *McClung* and *Richardson* represent the more considered view. In this case, as in *McClung*, there is no question that the Park Owners have satisfied Arti-

---

[6]Much of the confusion stems from dicta in our decision in *Southern Pacific Transportation Company v. City of Los Angeles*, 922 F.2d 498 (9th Cir. 1990), where we noted in the context of a takings claim that "ripeness is more than a mere procedural question; it is determinative of jurisdiction" and remarked that the lack of ripeness "may be raised sua sponte if not raised by the parties." *Id.* at 502. *Southern Pacific* was decided previous to the Supreme Court's decisions in *Palozzolo*, *Suitum*, and *Lucas*, and this language is inconsistent with those decisions.

cle III requirements, including ripeness. We have held, in another context, that "the [Article III] ripeness inquiry contains *both* a constitutional and a prudential component." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc) (emphasis added); *see also Colwell*, 558 F.3d at 1123 ("[R]ipeness doctrine reflects both constitutional and prudential considerations."). We stated in *Thomas* that the Article III component of the ripeness inquiry "can be characterized as standing on a timeline," and that the real question in cases presenting questions of Article III ripeness is whether "there exists a constitutional 'case or controversy,' [and] that the issues presented are 'definite and concrete, not hypothetical and abstract.' " 220 F.3d at 1138, 1139 (quotations omitted). *See also Colwell*, 558 F.3d at 1123. Where it is clear that a takings plaintiff has standing— including "standing on a timeline"—and has "presented a genuine case or controversy sufficient to satisfy Article III," the further questions under *Williamson* of whether a plaintiff has "received a final decision regarding the application of the challenged regulations to the property at issue" and whether the he has "sought compensation through the procedures the State has provided for doing so" are merely "prudential ripeness requirements." *Suitum*, 520 U.S. at 733 n.7, 734 (internal alterations and quotation marks omitted). In this case, then, where the Park Owners have obviously presented a live case or controversy, *see supra* Part II.A, it is clear that any further questions under *Williamson* do not raise the spectre of an Article III jurisdictional bar. *See Colwell*, 558 F.3d at 1123 (noting that because "[p]laintiffs' stake in the legal issues is concrete rather than abstract . . . the ripeness requirement of Article III is satisfied.").

3

Having reviewed the *Williamson* jurisprudence, we find that we may reach the merits of the Park Owners' takings claim. For the following reasons, "we do not think it prudent

to apply that prudential requirement here." *Lucas*, 505 U.S. at 1013.

First, the City forfeited its claim that the case was not ripe for decision. Because the *Williamson* requirements are "prudential ripeness principles," *Suitum*, 520 U.S. at 733-34, and not Article III jurisdictional limitations, they may be waived or forfeited. After *Lingle* prompted the parties to stipulate to vacate the initial judgment of the district court and return for litigation at the trial level, the City had the burden to raise any remaining prudential concerns under *Williamson*. Instead, the City was content to continue litigating the claims on the merits. The City expressed no doubts that the record in the case was fit for a decision by a federal court. Moreover, the City was not concerned that the Park Owners' failure to initiate an inverse condemnation action in state court left any doubt as to whether the state had yet compelled the City to provide just compensation to the Park Owners. The City did not, in fact, mention ripeness at all until prompted by an order from this court to discuss the issue at oral argument.

At oral argument, the City acknowledged that as part of its appeal it had not even considered whether *Williamson* prevented us from reaching the Park Owners' takings claims, and first came to the position that *Williamson* did so after receiving our order to be prepared to discuss *Williamson* at oral argument. The City argued to us that the case was not ripe under *Williamson*, and offered as supporting authority our opinions in *Equity Lifestyle Properties*[7] and *Carson Harbor Village*. Neither of these cases, nor in fact *Williamson* itself, appeared in the City's appellate brief.[8] In answer to our ques-

---

[7]*Equity Lifestyle Props., Inc. v. County of San Luis Obispo* ("*Equity Lifestyle Properties*"), 505 F.3d 860 (9th Cir. 2007), *withdrawn and superseded on denial of rehearing by Equity Lifestyle*, 548 F.3d at 1184.

[8]The opinion in *Equity Lifestyle Properties* was not filed until September 17, 2007, and so could not have been included in the City's brief, initially filed March 12, 2007. However, *Williamson* and *Carson Harbor Village* had been decided several years earlier, as had numerous other *Williamson* cases, and *Equity Lifestyle Properties* could have been offered in a letter under FED. R. APP. P. 28(j).

tions, the City expressly conceded that the *Williamson* requirements were merely prudential and not Article III jurisdictional requirements. The City argued that its claim was not waived because we could still exercise our discretion to find that the case was not ripe because of prudential considerations. The City's argument lacks merit, however. Because the *Williamson* requirements are merely prudential, the claims can be waived. The fact that we may exercise our discretion to find the claims unripe does not change the fact that the claims are waivable, and that in this case the City forfeited them.[9]

The fact that the City forfeited its ripeness claim has an additional, evidentiary implication. It confirms our belief that the record in this case is eminently ripe for review. *Williamson* could have resurfaced at the time that *Lingle* implicitly foreclosed the Park Owners' exception from *Williamson* based on the "substantially advances" theory. It did not. It would certainly seem counter-intuitive to us now to think that a case that had at that point already been litigated through three rounds—two in federal court and one in state court— could suddenly become "unripe." The fact that the City failed to notice this as well suggests to us that any concerns meant to be protected by *Williamson* had been sufficiently protected by the unusual and lengthy development of the case. *See Palazzolo*, 533 U.S. at 622 (holding that the purpose of *Williamson* is to develop the record in order to understand the effect of the challenged regulation).

---

[9]Moreover, *Equity Lifestyle* and *Carson Harbor Village* do not control our decision here. Those cases used the general principles of *Williamson* and found the property owners' as-applied takings claims had not been properly exhausted. *See Equity Lifestyle*, 548 F.3d at 1190-92; *Carson Harbor Village*, 37 F.3d at 474-75. Neither case dealt with the application of *Williamson* in a case where the government failed to raise the ripeness issue on appeal after the district court implicitly found the takings claims ripe. Similarly, neither case presented the question of whether we could find that the property owners had substantially satisfied the prudential concerns embodied in *Williamson* after three rounds of trial-level litigation in state and federal court.

Second, we find that the Park Owners have substantially satisfied the *Williamson* requirements. "[I]t is important to bear in mind the purpose" that the *Williamson* requirement serves. *Id*. at 622. *Williamson* held that a facial takings claim could not be ripe until the property owner has "unsuccessfully attempted to obtain just compensation through the procedures provided by the State for obtaining such compensation." 473 U.S. at 195. Here, the Park Owners did, in fact, take this case to state court. Although they did not file a formal inverse condemnation proceeding, they litigated and settled several state law issues relevant to the alleged taking with the City, including issues necessary to establish the timeliness of the takings claim. They then returned to federal court, without having been compensated for the taking of their property. There is no doubt that they have now unsuccessfully attempted to obtain just compensation through procedures provided by the State. *See id*.

Moreover, there is just no question that the case is fit for review. The parties have now litigated this case through three full rounds at the trial court level. There is no doubt that there is sufficient evidence in the record to "determine whether [the] regulation goes 'too far.' " *Palazzolo*, 533 U.S. at 622 (quoting *MacDonald*, 477 U.S. at 348). In addition, as we discuss below, it is *undisputed* that: (1) the RCO has caused a significant loss of value to the Park Owners' property; and (2) neither the City of Goleta nor the State of California has ever offered compensation for this loss in value. To the contrary, the City has litigated against providing compensation continuously since 2002.

**[6]** Given the Park Owners' substantial compliance with the *Williamson* requirements, and the City's forfeiture of the ripeness claim, we believe that *Lucas* compels us to reach the merits of this case. "In these circumstances, we think it would not accord with sound process to insist that [the Park Owners] pursue the late-created" need to file a formal inverse condemnation action in state court "before [their] takings claim can

be considered ripe." *Lucas*, 505 U.S. at 1012. Just like Lucas, the Park Owners "[have] properly alleged Article III injury in fact in this case." *Id.* Any failure to have filed a formal inverse condemnation claim while already in state court "goes only to the prudential 'ripeness' of [the Park Owners'] challenge, and for the reasons discussed we do not think it prudent to apply that prudential requirement here." *Id*. at 1013.

## III

**[7]** Having held that we may reach the merits of the Park Owners' takings claims, we now turn to those claims.**[10]** As we have recently summarized, the Supreme Court has identified three basic categories of regulatory takings claims:

> [1] where government requires an owner to suffer a permanent physical invasion of property, *see Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982); [2] where a regulation deprives an owner of all economically beneficial use of property, *see Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992); and [3] where the *Penn Central* factors are met, *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978).

*Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851, 855 (9th Cir. 2007); *see Lingle*, 544 U.S. at 538. On appeal, the Park Owners raise only a facial challenge under *Penn Central*.

---

**[10]**We review a district court's ruling on summary judgment that no regulatory taking has occurred *de novo. Gammoh v. City of La Habra*, 395 F.3d 1114, 1122 (9th Cir. 2005). "We must determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Id.* (internal quotation and citation omitted).

As described in *Lingle*,

> The Court in *Penn Central* acknowledged that it had hitherto been unable to develop any set formula for evaluating regulatory takings claims, but identified several factors that have particular significance. Primary among those factors are the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations. In addition, the character of the governmental action— for instance whether it amounts to a physical invasion or instead merely affects property interests through some public program adjusting the benefits and burdens of economic life to promote the common good —may be relevant in discerning whether a taking has occurred. The *Penn Central* factors—though each has given rise to vexing subsidiary questions—have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or *Lucas* rules.

544 U.S. at 538-39 (internal quotation marks and citations omitted). We must first address each factor in turn, and then weigh the factors together, in what has famously been described as an "essentially ad-hoc, factual inquir[y]." *Penn Central*, 438 U.S. at 124. Before we can apply the *Penn Central* factors, however, we must consider the viability of a facial challenge under *Penn Central*, and determine what facts we may consider when engaging in *Penn Central*'s ad-hoc factual inquiry.

### A

The Park Owners have brought only a facial challenge to the RCO under *Penn Central*—they have not brought a corollary as-applied claim. Unlike an as-applied challenge, which asserts that a statute or regulation "by its own terms,

infringe[s] constitutional freedoms in the circumstances of the particular case," *United States v. Christian Echoes Nat'l Ministry, Inc.*, 404 U.S. 561, 565 (1972), a facial challenge alleges that the statute or regulation is unconstitutional in the abstract: that "no set of circumstances exists under which the [a]ct would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

The Park Owners' decision to refrain from an as-applied challenge has two important consequences. First, as noted above, the decision exempts the Park Owners from the "final decision" prong of *Williamson*. *See Hacienda Valley Mobile Estates*, 353 F.3d at 655 ("Facial challenges are exempt from the ["final decision"] prong of the *Williamson* ripeness analysis because a facial challenge by its nature does not involve a decision applying the statute or regulation."). Second, the Park Owners' decision to cast their *Penn Central* claim as a facial challenge places limits on the types of evidence that can be considered in adjudicating the claim. "In facial takings claims, our inquiry is limited to 'whether the mere enactment of the [regulation] constitutes a taking.' " *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 216 F.3d 764, 773 (9th Cir. 2000) (quoting *Agins*, 447 U.S. at 260); *see also Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 295 (1981). More specifically, in a facial challenge "we look only to the regulation's general scope and dominant features, rather than to the effect of the application of the regulation in specific circumstances." *Tahoe-Sierra*, 216 F.3d at 773 (internal quotation marks and citation omitted).

For this reason, the Supreme Court has noted that property owners bringing a facial takings challenge "face an uphill battle." *Suitum*, 520 U.S. at 736 n.10; *see Keystone*, 480 U.S. at 495. The fact that the Park Owners have characterized their facial challenge under *Penn Central* creates further complications. In a typical *Penn Central* claim, the court must consider factors that will usually not be found in the text of the statute, such as the economic impact on the claimant and the claim-

ant's investment-backed expectations. Nevertheless, when adjudicating a facial challenge, the court must be careful not to simply look at "the effect of the application of the regulation in specific circumstances." *Tahoe-Sierra*, 216 F.3d at 773. The Park Owner's facial *Penn Central* claim requires us to address this apparent paradox: we must confront the question of whether a facial challenge under *Penn Central* is actually a viable legal claim; and if we determine that it is, we must then consider what evidence the Park Owners may present to prove their claim.

1

In the district court's summary judgment ruling of April 5, 2006, the court reviewed the record and engaged in a detailed *Penn Central* analysis. Each party had proffered an expert report in support of its position: the Park Owners proffered a report by Dr. John M. Quigley,[11] and the City responded with a report by Mr. William Thomsen.[12] In its April ruling, although the district court did not rely on the detailed figures presented in either report, the district court did credit the core findings of each report (which we discuss *infra*). The district court found in favor of the City under *Penn Central*. Subsequently, the district court issued another summary judgment ruling on September 6, 2006, in which it purported to address the Park Owners' remaining claims. The district court then reaffirmed its ruling that the Park Owners had not prevailed under *Penn Central*. The district court's ruling was ambiguous, however, as to the basis for its decision. The court was unclear as to whether it was simply re-incorporating and re-

---

[11]Dr. Quigley is a professor of economics, business, and policy at the University of California, Berkeley and serves as the Director of the Berkeley Program on Housing and Urban Policy. He served as President and Director of the American Real Estate and Urban Economics Association and has been a member of the National Academy of Sciences/National Research Council Committee on National Urban Policy.

[12]Mr. Thomsen is an MBA/CFA with the accounting firm of Grobstein, Horwath & Company, LLP.

affirming the *Penn Central* analysis applied in its April ruling, or whether it now based its ruling on the new ground that the Park Owners were precluded from presenting any of the evidence the court had relied on in April because the Park Owners brought only a facial challenge. The district court stated that the evidence the Park Owners sought to present "at trial" was "irrelevant" to a facial challenge, and complained that the Park Owners had "impermissibly attempted to convert this action, *de facto*, into an as-applied challenge." Because of the necessarily "ad hoc" nature of a *Penn Central* challenge, if the district court was adopting a rule that a property owner may present *no* evidence of the effect of a regulation on his property in a facial challenge, the court would essentially be adopting the rule that there is no such thing as a facial challenge under *Penn Central*.

Similarly, the City's position to our court on the meaning of a facial *Penn Central* challenge is ambiguous. The City has never argued that a facial challenge under *Penn Central* is not a viable legal claim. On the contrary, the City devoted much of its briefing and oral argument to defending the district court's April ruling on the Park Owners' *Penn Central* facial challenge, including the court's reliance on the core conclusions of the two parties' expert reports. In defending the conclusion of the district court on appeal, the City argues:

> [T]he district court concluded that absent the Ordinance, Park Owners would have achieved higher rates of return. This conclusion credits Park Owners' economic evidence and essentially agreed with Park Owners that the Ordinance had an economic impact on their business operation. It is difficult to imagine how the court's analysis and conclusion regarding the Ordinance's economic impact can be found lacking.

Elsewhere in its brief, however, the City complains that the Park Owners have introduced so much evidence as to try to

turn a facial challenge into an as-applied challenge. The City does not point out which evidence is proper and which is impermissible in a facial challenge.

**[8]** Both logic and Supreme Court precedent support our conclusion that a facial challenge under *Penn Central* must exist as a viable legal claim. Certainly it is apparent that a facial challenge is easier to mount under either *Loretto* or *Lucas*. It is far easier to prove that a regulation effects a physical invasion or that it denies an owner of all economically viable use of his property without considering evidence beyond the face of the regulation than it is to demonstrate that the regulation's effect satisfies the multi-factor test of *Penn Central*. However, we have recently described the *Loretto* and *Lucas* tests as categorical "exceptions to the application of the regulatory takings test" as set forth in *Penn Central*. *Scheehle v. Justices of the Sup. Ct. of Ariz.*, 508 F.3d 887, 894 (9th Cir. 2007); *see Lingle*, 544 U.S. at 538 ("Outside these two relatively narrow categories . . . , regulatory takings challenges are governed by the standards set forth in *Penn Central*."). In fact, the Supreme Court has emphasized that *per se* takings claims are disfavored, whereas *Penn Central* claims are preferred. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321, 339, 342 (2002). It would seem incongruous indeed if only the disfavored *exceptions* to *Penn Central* could be brought as facial challenges, where a claim under the general rule of *Penn Central* could not.

**[9]** Supreme Court precedent also demonstrates the viability of a facial challenge under *Penn Central*. In *Keystone*, the Court emphasized the difficulty of prevailing on a facial challenge under *Penn Central*, and ultimately concluded that the mere enactment of the challenged statute did not effect a taking. *See Keystone*, 480 U.S. at 493-99. The Court's ruling implicitly recognizes that a facial *Penn Central* challenge is feasible. Moreover, in *Keystone*, the Court considered the limited evidence that the property owners had proffered, includ-

ing the actual tonnage of coal that the challenged statutes prevented the owners from removing, and the percentage of total coal in the mine that the restricted tonnage represented. *See id.* at 496-99 & n.24. The Court found that the property owners's facial challenge under *Penn Central* failed because the evidence the property owners provided was insufficient to demonstrate economic harm in any significant amount. *Id.* Thus, the Court found against the property owners not because the Court was not permitted to consider the evidence provided, but rather because the property owners' evidence did not show that the mere enactment of the statute amounted to a taking.[13] *Keystone* suggests that a facial *Penn Central* challenge is difficult, but viable. Similarly, in *Connolly v. Pension Benefit Guaranty Corp.*, the Court considered and rejected a facial *Penn Central* challenge to the withdrawal liability provisions of the Multiemployer Pension Plan Amendments Act of 1980. 475 U.S. 211, 213, 224-28 (1986); *see also Tahoe-Sierra*, 535 U.S. at 321 (holding that the property owners' facial takings claim should have been brought under *Penn Central*); *Hodel*, 452 U.S. at 294-97 (ruling on a facial challenge under *Penn Central*). *Keystone* and *Connolly* demonstrate that a facial challenge under *Penn Central* may be difficult, but the mere fact that *Penn Central* requires an ad-hoc multi-factor balancing test does not bar a facial challenge.

2

The fact that the Court's precedents approve of a facial challenge under *Penn Central* requires us to consider what kinds of evidence beyond the text of the challenged regulation

---

[13]To be precise, in *Keystone*, the property owners expressly appealed only a facial challenge because they wanted to avoid the expense of producing the detailed evidence they believed would be necessary to mount an as-applied challenge. *See Keystone*, 480 U.S. at 493-94. Thus, the issue before the Supreme Court was not how *much* evidence a property owner may produce in a facial challenge, it was how *little* evidence the property owner could produce and still prevail in a facial challenge. The Court found the property owners had not produced enough. *See id.* at 494-502.

the reviewing court may consider. A facial challenge seeks to prove that "the 'mere enactment' of the [regulation] constitutes a taking." *Keystone*, 480 U.S. at 495 (quoting *Hodel*, 452 U.S. at 295). Property owners "thus face an uphill battle in making a facial attack on [a regulation] as a taking." *Id.* at 495. In reviewing a facial challenge under the Takings Clause, we "look only to the regulation's general scope and dominant features, rather than to the effect of the application of the regulation in specific circumstances." *Tahoe-Sierra*, 216 F.3d at 773 (quotation marks omitted). In a takings case, however, we are cognizant that the text of the regulation itself will rarely describe the actual economic effect on property owners in concrete terms. Thus, the very nature of a takings inquiry would seem to require that we consider *some* evidence outside of the text of the statute. *See id.* at 781 n.24 (discussing the tension between the demands of a facial challenge and the necessity of demonstrating the economic impact of the regulation in a takings claim, and suggesting that there are still open questions as to what kinds of information may be considered in a facial takings claim); *Garneau v. City of Seattle*, 147 F.3d 802, 807-08 (9th Cir. 1998) (evaluating a facial regulatory takings claim, and stating that plaintiffs have the burden of "introducing evidence of the economic impact of the enactment . . . on their property").

The proper inquiry in a facial challenge is not whether the property owners can demonstrate that property has been taken without providing evidence beyond the text of the regulation; the inquiry is whether the "mere enactment" of the regulation constitutes a taking. *See Keystone*, 480 U.S. at 495 (quotation marks omitted). Thus, in a takings claim, we must look not only at what the statute says, but also at what its mere enactment does. *See Garneau*, 147 F.3d at 807-08. At a minimum, we must look to the general economic principles that allow us to interpret the statute's effect, so that we may understand the regulation's general scope and dominant features. *Cf. Yee*, 503 U.S. at 526-31 (reviewing academic literature to understand the economic effects of a mobile home rent control ordi-

nance); *Keystone*, 480 U.S. at 500-02 (using economic principles to understand the impact of a coal mining regulation where Pennsylvania law creates unique, severable interests in land related to coal mining); *Tahoe-Sierra*, 216 F.3d at 776-77 (using academic literature to develop an analysis to determine whether a temporary moratorium on development effects a taking). In addition, there must be a way to understand the economic impact on the complaining property owner. A property owner who is not permitted at least to present evidence that proves that he has actually suffered the kind of economic harm of which he complains would be precluded from even proving his own standing to bring the claim —the property owner must be permitted to adduce evidence that he has suffered the injury for which he seeks redress. *See Lujan*, 504 U.S. at 563; *Pennell v. City of San Jose*, 485 U.S. 1, 6-7 (1988) (requiring the property owners to allege standing to bring a takings claim by alleging that they are likely to suffer economic injury by enforcement of the challenged ordinance). Thus, even in a facial challenge, the court may consider evidence related to the individual property owner that illustrates the economic impact that the mere enactment of the statute had on that owner and proves that the owner has suffered the injury of which he complains. *See Keystone*, 480 U.S. at 496-99 (considering evidence of the actual tonnage of coal the regulations rendered unremovable); *Garneau*, 147 F.3d at 807-08 (stating that plaintiffs bringing a facial challenge "must show that the value of their property diminished as a consequence" of the regulation); *Richardson*, 124 F.3d at 1154 n.2 (providing an example using exact dollar amounts as "illustrative" of the economic impact of the regulation in a facial challenge).

In this case, the Park Owners submitted evidence of the effect that the mere enactment of the RCO had on their property. The Park Owners principally relied on the report by Dr. Quigley. The City did not object to the use of this report; on the contrary, the City responded by producing its own expert report by Mr. Thomsen. The district court reviewed both par-

ties' expert reports in preparation for its summary judgment ruling in April. In conducting its analysis, the district court did not rely on the detailed information provided in each report about the actual economic impact of the RCO on each particular mobile home within the Park, nor did it rely on the information about the actual impact on the Park as a whole. Instead, the district court relied on the core findings of the expert reports and the general findings taken from economic studies and academic literature about the effects of mobile rent control ordinances generally. On appeal to this court, the City has defended the district court's analysis and its use of core findings from each party's expert report. It has argued, however, that attempts by the Park Owners to provide evidence beyond the core findings of the Quigley Report is an impermissible attempt to convert a facial challenge into an as-applied challenge. The City has not identified which evidence would be so property-specific as to be impermissible in a facial challenge.

We need not, however, determine the exact boundaries between permissible and impermissible kinds of evidence to support a facial challenge. The City has defended the district court's use of core findings from each party's report. Therefore, we will confine ourselves to review of these same core findings in our review of the Park Owners' facial *Penn Central* challenge. We will provide additional figures from the Quigley Report only for purposes of demonstrating that the Park Owners have suffered the actual economic injury of which they complain and illustrating in concrete terms the economic impact that the "mere enactment" of the RCO had in Goleta. In addition, we may consider the district court's undisputed factual findings about property values in the City of Goleta, as these values affect the entire City, and thus everyone subject to the City's RCO, and are not specific to the RCO's application to the Park Owners. With these limitations in mind, we consider the three factors of the *Penn Central* analysis.

**Volume 2 of 2**

## B

The three factors described in *Penn Central* are: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with investment-backed expectations; and (3) the character of the governmental action. We consider each in turn.

## 1

**[10]** The first consideration under *Penn Central* is the "economic impact of the regulation on the claimant." *Lingle*, 544 U.S. at 538-39 (quoting *Penn Central*, 438 U.S. at 124). There is no mathematical formula provided by the Constitution, but "if [the] regulation goes too far it will be recognized as a taking." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). By definition, under *Penn Central*, the property owners need not show a complete deprivation of all economically viable use of the property. Deprivation of *all* economically viable use would entitle the property owners to just compensation under *Lucas*, and there would be no need to apply a *Penn Central* analysis. *See Palazzolo*, 533 U.S. at 617 ("Where a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred . . . ." ). In sum, to prevail under *Penn Central*, the property owner must demonstrate a loss of value that may be less than 100 percent, but high enough to have "go[ne] too far." *Id*.

**[11]** There is a broad consensus that a mobile home rent control ordinance like the RCO causes a wealth transfer from the mobile home park owners to the incumbent mobile home tenants. The Quigley Report explained how the RCO affects the mobile home market. Mobile homes have a divided ownership. A park owner owns the real estate, consisting of the home sites, while the home itself is owned by the tenant who rents the site. When a jurisdiction enacts a rent control ordinance, the right to occupy a mobile home site at a below-

market rent acquires its own intrinsic value distinct from the value of the land. The owner of a given mobile home at the time the RCO is passed will capitalize this value (equal to the present value of the future stream of rent discounts) into the selling price of the home. This is referred to as the "transfer premium." A new mobile home tenant, anxious to acquire the right to regulated, below-market rent, pays the transfer premium in the form of a higher purchase price for the home. The net effect is that the cost of the home and the rental site is approximately the same whether there is an RCO or not; the difference is that under the RCO, the value of the capitalized rent is paid to the mobile home owner instead of to the park owner.[14] Accordingly, in the end, the RCO does not actually

[14]The Quigley Report illustrated these points with figures for the average property in its sample of dwellings sold in the Park during the relevant period. The Report estimated that, based on comparable land rental rates, the annual unregulated market rental rate of the average site in the Park would be $13,344. The RCO-regulated rental rate on the average site is only $3,256. Thus, a home owner pays roughly $10,000 less in annual rent to the Park Owners. This annual savings, however, is reflected in the selling price of the mobile home. The Report estimated that the average mobile home, but for the RCO, would be worth $14,037. Because of the RCO, however, the average mobile home sold for $119,091. This difference equals $105,054, or a full 88 percent of the entire sale price, and represents the net present value to the mobile home owner of being able to save roughly $10,000 a year in rent.

As a hypothetical, the Quigley Report then calculated what would happen if a mobile home owner financed the average home with a typical mortgage product used for these kinds of purchases. The Quigley Report found that, under the RCO, the average annual housing-related payments of the purchaser would be: $13,968 in loan repayment plus $3,256 in regulated rent. Without the RCO, because the same home would have sold for $105,054 less, but rent would have been more, the average annual housing-related payments would be: $1,646 in loan repayment plus $13,344 in rent. As the Quigley Report noted, in this particular example, the mobile home owner would actually be paying *more* annually under the City's RCO than he would in an unregulated market. This is due in part to the fact that mobile home mortgage products tend to have higher interest rates and their purchasers often have low asset levels or weaker credit histories. In general, however, the Quigley Report suggests that mobile

decrease housing costs at all for the new tenant. If a new tenant purchases the home, the new tenant will have to pay an amount equal to the rental discount in the form of the transfer premium.

The Quigley Report summarizes the effect of the RCO:

> For every dollar by which housing costs are reduced through lower mobile home rents, consumers are forced to pay higher purchase prices for these mobile homes. These two effects roughly cancel. Thus, the principal effect of the rent control regulation is to inhibit increases in the supply of affordable housing in the market and consequently to increase rents in the local economy. The principal costs are borne by those consumers who otherwise would have been able to reside in lower cost housing in the region.

The Quigley Report estimated that the RCO forced the Park Owners to rent the entire Park at close to an 80 percent discount below the market rate. The RCO has resulted in transfer premiums of approximately 90 percent of the sale price of mobile homes, enjoyed by the incumbent tenants.

The district court credited the Quigley Report's findings and found that the RCO causes a wealth transfer from the Park Owners to their tenants. The district court found that housing costs in the City of Goleta increased "approximately 205% from 1997 to 2003, and increased another 21.1% in 2004. The rent on the rent-controlled spaces in the Park [has]

_____

home owners will end up paying roughly the same amount in annual expenses whether or not the RCO is in effect. The difference is in who captures the value of the rent-controlled site in the Park. Without the RCO, the Park owners receive roughly $10,000 more a year in rent. With the RCO, the incumbent mobile home owners receive a one-time premium of $105,054, captured in the sale value of their home.

not kept up with the increase in housing costs." The court found:

> The RCO has resulted in what is known as "transfer premiums" in the sale of mobile homes. These transfer premiums constitute approximately 90% of the sale price of mobile homes in the Park. No provisions in the RCO prevents the seller of a mobile home from capturing transfer premiums.

More simply, "an average mobile home worth $12,000 would sell for approximately $100,000." The district court concluded that "the uncontroverted facts . . . establish the existence of a premium." Indeed, it found that even "[t]he City has acknowledged the existence of such a premium."[15] The Supreme Court observed the same wealth transfer phenomenon in *Yee*:

> [T]he effect of the rent control ordinance, coupled with the restrictions on the park owner's freedom to reject new tenants, is to increase significantly the value of the mobile home. This increased value normally benefits only the tenant in possession at the time the rent control is imposed. Petitioners are correct in citing the existence of this premium as a difference between the alleged effect of the [challenged] ordinance and that of an ordinary apartment rent control statute. Most apartment tenants do not sell anything to their successors (and are often prohibited from charging "key money"), so a typical rent control statute will transfer wealth from the

___

[15]The City's own expert, William Thomsen, recognized the existence of the transfer premium in his report: "residents who departed the Park and were able to sell their homes at a premium have received an additional benefit in that the capitalized economic benefit of this rent control could then be used to finance the purchase of another home or otherwise help defray occupancy costs elsewhere."

> landlord to the incumbent tenant and all future tenants. By contrast, petitioners contend that the [challenged] ordinance transfers wealth only to the incumbent mobile home owner.

503 U.S. at 530 (internal citation omitted). The Court in *Yee*, however, left open the question of whether the wealth transfer constitutes a regulatory taking under *Penn Central* because the only issue before the Court was whether the wealth transfer constituted a *per se* taking under *Loretto*. *See id.*

Our past cases have observed the wealth transfer effect as well, but the posture of those cases or differences in takings law when those cases were decided made it unnecessary to reach the question of whether the wealth transfer effected a regulatory taking under *Penn Central. See, e.g.*, *Richardson*, 124 F.3d at 1165-66; *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 685-89 (9th Cir. 1993); *Hall v. City of Santa Barbara*, 833 F.2d 1270, 1276-77, 1279 (9th Cir. 1987) ("[T]he tenant gets an interest that he can liquidate and take with him when he leaves the property, or even the City of Santa Barbara."), *overruled on other grounds by Yee*, 503 U.S. at 529-30; *see also Chi. Bd. of Realtors*, *Inc. v. City of Chicago*, 819 F.2d 732, 741-42 (7th Cir. 1987) (separate opinion of Posner, J., with whom Easterbrook J., joined) (detailing empirical studies and economic analyses showing that rent control regulations reduce the quantity and quality of affordable housing).[16]

---

[16]Academic literature has also discussed the wealth transfer created by mobile home rent control ordinances. *See, e.g.*, William A. Fischel, *Exploring the Kozinski Paradox: Why Is More Efficient Regulation a Taking of Property?*, 67 CHI.-KENT. L. REV. 865, 872-75 (1991); Werner Z. Hirsch & Joel G. Hirsch, *Legal-Economic Analysis of Rent Controls in a Mobile Home Context: Placement Values and Vacancy Decontrol*, 35 UCLA L. REV. 399, 405, 423-31 (1988); Richard A. Epstein, *Rent Control and the Theory of Efficient Regulation*, 54 BROOK. L. REV. 741, 758-59 (1988).

**[12]** The wealth transfer from the Park Owners to their tenants is a naked transfer accomplished by the mere enactment of the RCO. By taking the value of the Park Owners' mobile home sites and transferring it to the Park's incumbent tenants, the RCO has effected "the distribution of resources or opportunities to one group rather than another solely on the ground that those favored have exercised the raw political power to obtain what they want." Cass R. Sunstein, *Naked Preferences and the Constitution*, 84 COLUM. L. REV. 1689, 1689 (1984). In the classic naked transfer, the government takes property from A to give to B for the sole benefit of B. *See Kelo v. City of New London*, 545 U.S. 469, 477 (2005) ("[I]t has long been accepted that the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation."). In this case, the RCO works slightly differently, as the government does not act as a fiscal intermediary. Because of the divided ownership of mobile homes—the Park Owners own the real estate and the tenants own the home itself—the transfer can be effected directly by the mere enactment of the RCO. The RCO takes wealth from A, the Park Owners, and transfers it to B, the incumbent tenants, who reap the benefits in the form of mobile homes worth several times their original value.[17]

Incumbent tenants are not the only group that benefit from the City's passage of the RCO. The RCO also benefits another group: those who would like to support affordable

---

[17]As a result, the RCO is unlikely to increase the availability of affordable housing in the City of Goleta, for the widely-recognized reasons summarized in the Quigley Report. The RCO only affects a small portion of the total housing market in the City, and because of the potential to capitalize the value of the regulated rent into the sale price of the mobile home, even within the mobile home market, the RCO does not actually generate mobile home sites that are cheaper to live on than they would be if rents were unregulated. It is easy to see why mobile home tenants would encourage the City to adopt the County's RCO without further investigation as to whether such regulation was necessary in the real estate market of 2002.

housing initiatives without paying for it themselves, for example, owners and developers of other forms of housing such as apartments that might otherwise be forced to provide subsidized housing, and taxpayers who want to subsidize affordable housing without actually increasing their own tax liability to pay for it. *See Pennell*, 485 U.S. at 22 (Scalia, J., concurring in part and dissenting in part) ("The politically attractive feature of [rent control] regulation is not that it permits wealth transfers to be achieved that could not be achieved otherwise; but rather that it permits them to be achieved 'off budget,' . . . ." ) Thus, the City, "solely on the ground that those favored have exercised the raw political power to obtain what they want," has taken from A to give to B, both for the benefit of B (the incumbent tenants) and for a larger group, who does not wish to support affordable housing through more politic means. The Takings Clause does not prohibit this use of the police power, *see Kelo*, 545 U.S. at 489-90, but the Takings Clause does not ask us to pretend that such a naked transfer does not cause a severe, observable economic impact on the property owner whose property has been conscripted for the public's use.

The City's principal argument in response is that, even conceding the wealth transfer, the RCO's economic impact on the Park Owners does not amount to a *Penn Central* taking because the Park Owners can still earn a return on their investment.[18] The City supplied some evidence in the Thomsen

---

[18]The City also claimed that incumbent tenants do not necessarily benefit from the one-time wealth transfer in the form of the "transfer premium" because the transfer is not realized until the tenants sell their homes, and they do not all sell their homes. This claim is irrelevant to the point that real wealth has been transferred. Even if an incumbent tenant does not sell his mobile home, he may have realized value in it. He might, for example, be permitted to borrow against the increased value of the home created by the RCO while he remained in the home. To use the district court's figures, an incumbent tenant who purchased his home before the passage of the RCO for $12,000 could, after the passage of the RCO, take out a home equity loan against a $100,000 house.

Report to show that the Park Owners have earned, depending on the analysis, roughly 10 percent on their investment annually. According to the report, this return is, again depending on the analysis, comparable to or occasionally better than the return on investment earned by real estate investment trusts and other kinds of investments according to national indices.

The district court credited both the Park Owners' evidence of the wealth transfer and the City's evidence of return on investment. Reviewing the reports together it found:

> Considering all this evidence, a reasonable inference that may be drawn is that although Plaintiffs have received a rate of return on investment comparable to other real estate investments, and although they have enjoyed a significant appreciation in value of their property, Plaintiffs could have received higher rates of return in the absence of the [regulations].

The district court concluded that the wealth transfer was greater than any return on investment:

> The evidence of the rate of return is mixed. Although Plaintiffs have enjoyed a rate of return comparable to other real estate investments, Plaintiffs' evidence tends to suggest that they would have earned more— perhaps much more—in the absence of the RCO.

Nevertheless, the district court reasoned that because the Park Owners could receive *some* return on investment—even though it was less, perhaps even substantially less, than their wealth transfer loss—the Park Owners had not suffered a regulatory taking.

[13] We disagree with the district court's reasoning. The fact that the Park Owners earned some return on investment is not, as the district court reasoned, the end of their *Penn Central* claim. Even if the Park Owners earned some return

on investment, a taking may have occurred. If the Park Owners could show that the RCO denies them *all* return on investment, they could, of course, prevail on a *per se* takings claim under *Lucas*, and we would not have to labor through the *Penn Central* analysis. *Penn Central* thus practically assumes that the Park Owners may be able to earn some return on investment. Our challenge under *Penn Central* is to figure out what loss of potential return on investment, greater than zero but less than 100 percent, is significant enough to constitute a regulatory taking. *See Tahoe-Sierra*, 535 U.S. at 330. The district court thus erred in the conclusion that because plaintiffs can realize a "rate of return comparable to other real estate investments," the Park Owners have not suffered significant economic harm. *Cf. Hall*, 833 F.2d at 1278 ("The city's argument that [the mobile home park owners] are adequately compensated by the rents they receive is irrelevant to the determination of whether a taking has occurred . . . . Whether compensation is adequate is an inquiry separate from whether there has been a taking.").[19]

[14] The Park Owners may have enjoyed a positive rate of return, perhaps even a rate of return comparable to some other real estate investments, but the district court found, and neither the City nor the Thomsen Report denies, that the Park Owners "would have earned more—perhaps much more" if not for the RCO. Although the "much more" does not appear

---

[19]The dissent offers a different rationale from the city and the district court. Judge Kleinfeld argues that "[t]here is nothing in the record to support the notion that the Guggenheims' interest in the trailer park was worth more before than after the City reenacted the County ordinance." Dissenting Op. at 13880. As with the question of return on investment, this point is better addressed as a question of the taking compensation due rather than whether there was a taking. As Judge Kleinfeld admits, "[i]f this were a new rent control ordinance . . . this might be an actionable case." Dissenting Op. at 13879-80. It *is* a new ordinance, which is what makes this case ripe for review. *See supra* at 13822-34. We simply disagree that "readoption was merely a ministerial re-enactment . . . [and] had no economic impact on the Guggenheims." Dissenting Op. at 13879-80.

to have been reduced to a total dollars-and-cents loss, the district court also found—again without contradiction—that the loss could be as high as almost 90 percent of the sale price on a site-by-site, home-by-home basis. To illustrate this impact, the Quigley Report did estimate possible losses for individual units in the Park, and some of the figures run upwards of $100,000 per site. By any measure, that is a significant economic transfer from the Park Owners to the tenants, one that must be characterized as a loss for the Park Owners. *Cf. Cienega Gardens v. United States*, 331 F.3d 1319, 1343 (Fed. Cir. 2003) (finding that an extraction of 96 percent of the property's value was severe enough to constitute a taking under *Penn Central*). The undisputed evidence shows that the mere enactment of the RCO has caused a significant economic loss for the Park Owners. This factor weighs heavily in the Park Owners' favor.

2

**[15]** The next consideration is "the extent to which the regulation has interfered with distinct investment-backed expectations." *Lingle*, 544 U.S. at 539 (quoting *Penn Central*, 438 U.S. at 124). Here, it is undisputed that the RCO was passed in Santa Barbara County in 1979 and amended in 1987, and that the Park Owners purchased the Park in 1997. The purchase was eighteen years after the RCO was first passed by the County, but five years before the City of Goleta adopted the RCO in 2002. We agree with the finding of the district court, therefore, that the Park Owners "got exactly what they bargained for when they purchased the Park—a mobile-home park subject to a detailed rent control ordinance."[20] Thus, we

---

[20]The parties stipulated in their state-court settlement agreement that the RCO, originally a County ordinance, was not in effect for a brief period during the City's process of incorporation, as we have previously noted, *supra* n.2. This fact is relevant to the timeliness of the suit. Nonetheless, for the purposes of considering the Park Owners' investment-backed expectations, the district court found that the RCO had, for all practical purposes, been in effect "unchanged in substance, for all times relevant to the present action."

take pause at the notion that the Park Owners can claim that the challenged regulation took between 80 and 90 percent of the value out of their rental park when, apparently, this value had been extracted before they purchased the park.

Our analysis of this issue is controlled by *Palazzolo*. In that case, a corporation owned property at the time the government enacted the challenged regulation. 533 U.S. at 613. Palazzolo came into possession of the property in 1978 when the corporation's charter was revoked and title to the property passed, by operation of law, to Palazzolo as the sole shareholder. *Id.* at 614. At that time, the property was already subject to the regulation that designated the property as part of protected "coastal wetlands" upon which development would be limited. *Id.* The Rhode Island Supreme Court held that Palazzolo could not, therefore, bring a takings claim because "[a] purchaser or a successive title holder like [Palazzolo] is deemed to have notice of an earlier-enacted restriction and is barred from claiming that it effects a taking." *Id.* at 626. As the Supreme Court described the state high court's reasoning, "by prospective legislation the State can shape and define property rights and reasonable investment-backed expectations, and subsequent owners cannot claim any injury from lost value. After all, they purchased . . . with notice of the limitation." *Id.*

The Supreme Court reversed:

> The State may not put so potent a Hobbesian stick into the Lockean bundle . . . . Were we to accept the State's rule, the postenactment transfer of title would absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable. A State would be allowed, in effect, to put an expiration date on the Takings Clause. This ought not to be the rule. Future generations, too, have a right to challenge unreasonable limitations on the use and value of land.

*Id.* at 627-28.[21] Further, the Court pointed out that "[t]he State's rule would work a critical alteration to the nature of property, as the newly regulated landowner is stripped of the ability to transfer the interest which was possessed prior to the regulation. . . . A blanket rule that purchasers with notice have no compensation right when a claim becomes ripe is too blunt an instrument to accord with the duty to compensate for what is taken." *Id.* at 627.

The Court's concern, that a rule precluding post-enactment purchasers from bringing a regulatory taking claim would undesirably insulate the government from liability and allow the state to "secure a windfall for itself," *id.* at 627, is particularly salient on the facts before us. In 2002, the City of Goleta adopted the County's RCO, created to manage housing problems as they existed in 1979, apparently without any formal consideration of whether the problems still existed. Were the fact that the Park Owners purchased the Park when the County RCO was already in existence sufficient to bar their takings claim, the City of Goleta would be insulated from liability for the effects of adopting the RCO when the City incorporated in 2002. All of the existing park owners at that time had bought their parks when the land was still part of unincorporated Santa Barbara County. Unless any of these park owners had purchased their park prior to the original RCO enactment in 1979, all the park owners would have purchased with notice of the original RCO. By its own theory, the City was free to adopt the law with complete impunity, notwithstanding its obvious effects.

The *Palazzolo* Court explained why subsequent property owners do not lose their right to challenge the government's actions:

---

[21]The Court limited its reasoning to regulatory takings claims; physical takings claims resulting from a state's direct condemnation of property were distinguished as properly brought only by the property owner at the time of the condemnation. 533 U.S. at 628.

> *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987), presented the question whether it was consistent with the Takings Clause for a state regulatory agency to require oceanfront landowners to provide lateral beach access to the public as the condition for a development permit. The principal dissenting opinion observed it was a policy of the California Coastal Commission to require the condition, and that the Nollans, who purchased their home after the policy went into effect, were "on notice that new developments would be approved only if provisions were made for lateral beach access." *Id.,* at 860 (Brennan, J., dissenting). A majority of the Court rejected the proposition. "So long as the Commission could not have deprived the prior owners of the easement without compensating them," the Court reasoned, "the prior owners must be understood to have transferred their full property rights in conveying the lot." *Id.,* at 834, n.2.

*Palazzolo*, 533 U.S. at 629 (internal citations omitted). The Court also rejected analogies between purchasing a property subject to a challenged land-use regulation and purchasing a property whose contours are shaped by background principles of state law:

> It suffices to say that a regulation that otherwise would be unconstitutional absent compensation is not transformed into a background principle of the State's law by mere virtue of the passage of title. . . . A regulation or common-law rule cannot be a background principle for some owners but not for others.
> . . . A law does not become a background principle for subsequent owners by enactment itself. *Lucas* did not overrule our holding in *Nollan*, which, as we have noted, is based on essential Takings Clause principles.

*Palazzolo*, 533 U.S. at 629-30. The Court concluded by remanding for consideration of Palazzolo's *Penn Central* claim, stating, "[t]hat claim is not barred by the mere fact that title was acquired after the effective date of the state-imposed restriction." *Id.* at 630.[22]

**[16]** We have held that *Palazzolo* permits property owners who have purchased property subject to the regulations they challenge to bring regulatory takings claims under *Penn Central*. *See Equity Lifestyle*, 548 F.3d at 1190 (rejecting the county's argument that the property owner could not bring a takings claim because the owner acquired its interest in the property after the ordinance was passed because "a regulatory takings claim 'is not barred by the mere fact that title was acquired after the effective date of the state-imposed restriction' " (quoting *Palazzolo*, 533 U.S. at 630)); *Daniel v. County of Santa Barbara*, 288 F.3d 375, 383 (9th Cir. 2002) (holding that "[t]he Court's decision last Term in *Palazzolo* indicates that in some circumstances a purchaser may have a valid takings claim even if his or her purchase price was discounted to reflect existing land-use regulations," and that *Palazzolo* applied to regulatory but not physical takings claims). Our sister circuits have also observed in dicta that *Palazzolo* permits post-enactment purchasers to prevail on regulatory takings claims. *See Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 34 n.5, 37 (1st Cir. 2002) (en banc) (describing the *Palazzolo* holding as "whether property is acquired before or after a regulation is enacted does not completely determine the owner's reasonable investment-backed expectations"); *Abbott Labs. v. CVS Pharmacy, Inc.*, 290 F.3d 854, 860 (7th Cir. 2002) (analogizing from *Palazzolo* to find that a plaintiff

---

[22]Finally, we note that even before *Palazzolo*, the Supreme Court permitted property owners who purchased property subsequent to the enactment of the challenged regulation to bring regulatory takings claims. In *Penn Central* itself, one of the appellants, Union General Properties, acquired its leasehold interest in Grand Central Terminal in 1968, a year after the Terminal was designated as a landmark in 1967. *Penn Central*, 438 U.S. at 115-16.

company's claims against another survive the plaintiff's acquisition by another entity).

**[17]** *Palazzolo* left open the question of how to apply the "investment-backed expectations" analysis to property owners who purchased subject to the regulation. It merely remanded the case with instructions to address the merits of Palazzolo's claim under *Penn Central*. 533 U.S. at 630. Our sister circuits have yet to address the issue. *Penn Central* will not aid us because it never supplied "any 'set formula' " in the first place. *Penn Central*, 438 U.S. at 124. Instead, it "identified several factors that have particular significance" in what the Court described as an "ad hoc, factual inquir[y]." *Id.* After *Palazzolo*, we must continue to consider "[t]he economic impact of the regulation on the claimant" and the "character of the governmental action," *id.*, but we must not deem a regulatory takings claim forfeited simply because the property changed hands after the regulations went into effect.[23]

**[18]** We read *Palazzolo* to mean that even though the Park Owners purchased the Park in a regulated state similar to the one imposed by the City, the Park Owners may still prevail under *Penn Central*. How we are to apply *Penn Central* post-*Palazzolo* is less clear. The question of investment-backed expectations yields mixed results. On the one hand, as the district court found, the Park Owners' "expectations of the value of the Park when purchased, as well as the income to be received from the Park, should have been, at all times, tempered by the knowledge that the RCO would have an adverse

---

[23]We thus do not disagree with the dissent's statement that *Palazzolo* does not suggest that the mere "transfer of title revives dead claims." Dissenting Op. at 13880. But as Justice Kennedy stated in *Palazzolo*, "the postenactment transfer of title" ought not "absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable." 533 U.S. at 627 ("[A] regulation that otherwise would be unconstitutional absent compensation is not transformed into a background principle of the State's law by mere virtue of the passage of title.").

effect on their investment." On the other hand, when the Park Owners acquired the property, they also arguably acquired the prior owner's interest in the property, including the right to bring a takings action. *See Palazzolo*, 533 U.S. at 627; *see also CAMSI IV v. Hunter Tech. Corp.*, 282 Cal. Rptr. 80, 85 (Cal. Ct. App. 1991) ("the harm implicit in a tortious injury to property is harm to the property itself, and thus to *any* owner of the property once the property has been injured and not necessarily to a particular owner"). At the very least, the Park Owners have the right to bring a takings action based on the City's 2002 adoption of the RCO.

[19] These two interests are in tension and are, in some respects, self-referential: The new owner's investment-backed expectation depends on the value of any takings claim, but whether there is a regulatory taking turns on the owner's investment-backed expectations. In other words, in this context we cannot address the investment-backed expectation prong of *Penn Central* without referring to the merits of the takings claim, but in order to decide the takings claim, we must determine the Park Owners' investment-backed expectations.[24] There is no easy way out of this conundrum. For now we will acknowledge the dilemma: the Park Owners took possession of the Park knowing that it was subject to the County's (but not the City's) RCO. They also assumed ownership

---

[24]Judge Kleinfeld is concerned that the current mobile home tenants may not have received a windfall from the City's adoption of the RCO because they invested in reliance on the City's ordinance. Dissenting Op. at 13881-82. These are fair concerns that might be implicated if the City repealed the RCO in the future. *See Palazzolo*, 533 U.S. at 635 (O'Connor, J., concurring). On the other hand, as Justice O'Connor explained, the alternative is that "the State wields far too much power to redefine property rights upon passage of title." *Id.*; *see also id.* at 636-37 (Scalia, J., concurring). We do not think concerns over windfalls (or not) go to *whether* there has been a taking.

These are difficult questions, ones that—so far as we know—are uncharted. To the extent these questions are relevant, they should be addressed by the district court in the first instance.

with some hope that they would be able to challenge the RCO under the Takings Clause and, as they have done here, on equal protection, due process and state law grounds. We conclude, therefore, that the question of investment-backed expectations is not determinative but must be considered in tandem with the economic impact of the regulation on the Park Owners, and the character of the governmental action. *See Palazzolo*, 533 U.S. at 633 (O'Connor, J., concurring) ("[I]nterference with investment-backed expectations is one of a number of factors that a court must examine.").

3

**[20]** The final consideration is "the character of the governmental action." *Lingle*, 544 U.S. at 539 (quoting *Penn Central*, 438 U.S. at 124). We have seen two divergent interpretations of this test, both of which appear to derive from different portions of *Penn Central*. We consider each in turn.[25]

One test, applied less frequently in practice, considers "whether [the governmental action] amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.' " *Lingle*, 544 U.S. at 538 (quoting *Penn Central*, 438 U.S. at 124). The

---

[25]The district court applied yet a third version, whether there was anything "sinister in the purpose of," or "suspect" or "pretextual" about the regulations. The court's use of this test in a *Penn Central* analysis was in error, although the test may be relevant to a due process or equal protection claim. The district court evidently imported this requirement from our discussion in *Armendariz v. Penman*, 75 F.3d 1311 (9th Cir. 1996) (en banc), *overruled in part on other grounds as stated in Crown Point*, 506 F.3d at 853-56. That discussion, in which we considered whether the city's stated purpose in passing a housing code was a pretext for other, less noble purposes, was in the context of an Equal Protection claim that the housing code unfairly targeted certain property owners. *See Armendariz*, 75 F.3d at 1326-27. We did not consider the city's purpose when undertaking our takings claim analysis.

application of this test to our case is controlled by *Yee*, in which mobile home park owners claimed that a rent control ordinance almost identical to the RCO amounted to a physical taking under *Loretto*. *See* 503 U.S. at 529-30. The Supreme Court held that the rent control ordinance did not amount to the imposition of a physical invasion. *Id*. The Court, however, proceeded to state in no uncertain terms that the fact that the regulations caused a one-time wealth transfer from landlord to the incumbent tenants "might have some bearing on whether the ordinance causes a *regulatory* taking." *Id.* at 530.

The district court thought "the character of the governmental action is less like a *per se* taking and more like a permissible shifting of economic benefits and burdens." We disagree. Although we understand that the RCO does not amount to a physical taking, the RCO is substantially more like a "*regulatory* taking," *Yee*, 503 U.S. at 530, than a "mere[diminution of the Park Owners'] property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.' " *Lingle*, 544 U.S. at 539 (quoting *Penn Central*, 438 U.S. at 124). The RCO is quite unlike zoning or other restrictions that apply broadly to businesses and residences and inevitably restrict the property's uses. The Court has explained that its various formulations of the test for regulatory takings "(reflected in *Loretto*, *Lucas*, and *Penn Central*) . . . aim[ ] to identify regulatory actions that are functionally equivalent to the classic taking." *Id*. The RCO effects a transfer of the right to rents for the use of the property from the Park Owners to the tenants. The Park Owners may own the property on which the mobile homes rest, but under the RCO the tenants have the right to convey the home with the right to remain on the site at a much-reduced rent. This looks much more like a classic taking than a mere regulatory burden. This iteration of the "character of the governmental action" test weighs in favor of the Park Owners.

The second, more frequently applied iteration of the "character of the governmental action" test considers whether the

challenged regulation places a high burden on a few private property owners that should more fairly be apportioned more broadly among the tax base. *See Armstrong v. United States*, 364 U.S. 40, 49 (1960) ("The [Takings Clause] was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."); *see also Lingle*, 544 U.S. at 542-43 (discussing *Armstrong* with approval); *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 318-19 (1987) (applying *Armstrong* in a regulatory takings claim); *Penn Central*, 438 U.S. at 123.

We find *Cienega Gardens* persuasive as to the application of the *Armstrong* analysis in this case. *See* 331 F.3d at 1338. *Cienega Gardens* found a *Penn Central* taking where two federal statutes abrogated property developers' contractual rights to prepay their forty-year mortgage loans after twenty years. *See id.* at 1323-34. The effect of the statutes was to prevent the developers from exiting the low-rent housing programs in which they were required to participate while carrying the loans. *See id.* at 1323. These statutes led to a 96 percent loss of return on equity for the developers. *Id.* at 1343. *Cienega Gardens* found that the government action at issue placed the expense of low-income housing on a few private property owners (those who had previously participated in the federal loan program but now wanted to exit), instead of distributing the expense among all taxpayers in the form of incentives for developers to construct more low-rent apartments. *See* 331 F.3d at 1338-39.[26]

---

[26]The City argues that *Cienega Gardens* involved an abrogation of the plaintiffs' contractual property rights whereas this case involves an abrogation of the Park Owners' right to charge market rental rates. This distinction is not relevant here. Regulatory takings cases necessarily involve economic analyses, in which the formal characteristics of the transaction are less relevant than the economic substance. For example, in this case, the fact that Park Owners are not allowed to raise rents could also be considered an abrogation of contract rights—their right to contract for annual

**[21]** Here, the RCO applies only to mobile home park own-ers. The district court found that the City did not impose com-parable costs on any other property owners in the City, except as a condition of new development.[27] The City has singled out the Park Owners and imposed solely on them a burden to sup-port affordable housing. We find the Federal Circuit's reason-ing persuasive and applicable to the facts of this case:

> Unquestionably, Congress acted for a public purpose (to benefit a certain group of people in need of low-cost housing), but just as clearly, the expense was placed disproportionately on a few private property owners. Congress' objective in passing ELIHPA[28 ] and LIHPRHA[29 ]—preserving low-income housing —and method—forcing some owners to keep accepting below-market rents—is the kind of expense-shifting to a few persons that amounts to a taking. This is especially clear where, as here, the alternative was for all taxpayers to shoulder the bur-den. Congress could simply have appropriated more money for mortgage insurance and thereby induced

market-based rent increases. Similarly, the case could be analogized (cre-atively) to a land-use extraction case: the Park Owners are only permitted to operate a mobile home park in exchange for an agreement to rent it at 80 percent below existing market rates (which in turn could be analogized as an extraction that they may rent 20 percent of the park at full market rates if they agree to permit 80 percent of the tenants to live rent-free). *See, e.g.*, *Yee*, 503 U.S. at 530 (suggesting that a mobile home rent control ordinance may be analogized to land-use extraction and referencing *Nol-lan v. California Coastal Commission*, 483 U.S. 825 (1987)).

[27]For new developers in Goleta, the burden is substantially less severe. Although the Park Owners must rent their entire property at an 80 percent discount, new developers are only required to make 20 percent of their housing available at below-market rates.

[28]The Emergency Low Income Housing Preservation Act of 1987, 12 U.S.C. § 17151, note (1988).

[29]The Low-Income Housing Preservation and Resident Homeownership Act of 1990, 12 U.S.C. §§ 4101 *et seq.* (1994).

more developers to build low-rent apartments in the public housing program to replace housing, such as the plaintiffs', that was no longer part of the program.

331 F.3d at 1338-39; *see also Pa. Coal*, 260 U.S. at 416 ("In general it is not plain that a man's misfortunes or necessities will justify his shifting the damages to his neighbor's shoulders . . . . [A] strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change.").

[22] We do not doubt that the City's objective in passing the RCO was to increase the availability of low-cost housing. Singling out mobile home park owners, however, and forcing them to rent their property at a discount of 80 percent below its market value, "is the kind of expense-shifting to a few persons that amounts to a taking." *Cienega Gardens*, 331 F.3d at 1338-39. Moreover, the City has numerous alternatives for supporting affordable housing—such as tax incentives, low-cost loans, rent supports, or vouchers—without directing the burden at such a limited group. In sum, taking account of the "character of the governmental action" test in this case also weighs strongly in the Park Owners' favor.

C

[23] Having reviewed each factor individually, we must weigh them together. We conclude that the RCO has caused substantial economic hardship to the Park Owners. Property values in the area have increased by 225 percent in the time that the Park Owners have owned the Park, yet the Park Owners have not been permitted to increase rents beyond 75 percent of the annual increase in the CPI. This is a zero-sum game; loss to the Park Owners has become gain to their tenants. The RCO has forced the Park Owners to rent their property at an 80 percent discount below the market value,

resulting in transfer premiums equal to approximately 90 percent of the selling price of a mobile home. Thus, the savings created by these below-market rents are transferred directly into the pockets of the incumbent mobile home tenants, who can now sell their mobile homes for almost ten times their purchase price. *See Yee*, 503 U.S. at 530. Next, we agree with the district court that the RCO has not strongly interfered with the Park Owners' investment-backed expectations because the Park Owners purchased the Park when the Park was already regulated. Nevertheless, the mere fact that the Park Owners bought the Park in its regulated state does not mean that the City has not taken property by regulation or that the Park Owners cannot bring such a claim. *See Palazzolo*, 533 U.S. at 627-28. Finally, we conclude that the RCO looks more like a classic taking than a mere shifting of benefits and burdens, *see Yee*, 503 U.S. at 530, and that the RCO singles out mobile home park owners and forces them to bear a burden of providing affordable housing in the City that should fairly be born by the taxpayers as a whole. *See Armstrong*, 364 U.S. at 49.

**[24]** On balance, the City's RCO "goes too far" and constitutes a regulatory taking under the Fifth and Fourteenth Amendments for which just compensation must be paid. If the City of Goleta wishes to attempt to increase the availability of affordable housing by transferring the value of renting land within its jurisdiction from the Park Owners to the incumbent tenants, there is no constitutional impediment to doing so.[30] The Fifth Amendment of the U.S. Constitution, however, requires that the City compensate the Park Owners for taking their property by regulation.

---

[30]The Park Owners have not claimed that the government action is impermissible because it fails to meet the "public use" requirement. *See Kelo*, 545 U.S. at 472.

IV

The Park Owners also ask us to strike down the RCO as a violation of the Due Process Clause. In *Lingle*, the Supreme Court clarified the difference between a challenge to a rent control ordinance as a takings claim and as a substantive due process claim, and affirmed the independent vitality of both theories. "[The Takings Clause] is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference." *Lingle*, 544 U.S. at 537. As we have explained:

> Due process violations cannot be remedied under the Takings Clause, because if a government action is found to be impermissible—for instance because it fails to meet the 'public use' requirement or is so arbitrary as to violate due process—that is the end of the inquiry. No amount of compensation can authorize such action.

*Crown Point*, 506 F.3d at 856 (quoting *Equity Lifestyle Properties*, 505 F.3d at 870 n.16 (citation omitted)). The Park Owners have raised two different theories to support their due process claim, which we address in turn.

A

[25] The Park Owners' more "traditional" due process theory is foreclosed by precedent. The Supreme Court and we have upheld rent control laws as rationally related to a legitimate public purpose. *See Pennell v. City of San Jose*, 485 U.S. 1, 13 (1988); *Equity Lifestyle*, 548 F.3d at 1194; *Carson Harbor Village*, 37 F.3d at 472. In fact, we have already held that a mobile home park rent control ordinance similar to the one at issue survives a due process challenge. *See Carson Harbor Village*, 37 F.3d at 472. As in this case, the law challenged in *Carson Harbor Village* was ineffective at preserving low-

income housing and merely caused a wealth transfer from the park owners to incumbent tenants. We held:

> A generally applicable rent-control ordinance will survive a substantive due process challenge if it is *designed* to accomplish an objective within the government's police power, and if a rational relationship existed between the provisions and the purpose of the ordinances . . . . This deferential inquiry does not focus on the ultimate effectiveness of the law, but on whether the enacting body could have rationally believed at the time of enactment that the law would promote its objective.

*Id.* (internal quotation marks and citations omitted).

B

The Park Owners also raise a second due process theory: that the RCO is a denial of substantive due process because it fails to guarantee that they will earn a "fair and reasonable return" on their investment. For this claim, the Park Owners attack specifically RCO §§ 11A-5 and 11A-6. These sections detail the "automatic increase" of 75 percent of the CPI, and the procedures for requesting a "discretionary increase" where increased operating costs, capital expenses, and capital improvements are greater than the amount of the automatic increase. *See* RCO §§ 11A-5, 11A-6. The Park Owners argue that these provisions will necessarily lead to a time when the Park Owners are denied rent increases that permit a reasonable return on their investment. They also claim that the provisions are constitutionally infirm because they provide no mechanism by which Park Owners can challenge such rent caps and secure a reasonable return.

1

The Park Owners rely on a thin, but viable line of cases. In *Sierra Lake Reserve v. City of Rocklin*, we considered another mobile home park rent control ordinance that, like the one at issue, imposed rent caps and caused a wealth transfer to incumbent tenants. 938 F.2d 951, 954 (9th Cir. 1991), *vacated*, 506 U.S. 802 (1992).³¹ The plaintiffs argued that the provisions of the ordinance permitted only a passing through of increased costs, without allowing for a reasonable profit. *Id.* at 958 n.9. Reversing the district court's dismissal on a 12(b)(6) motion, we held that the park owner had alleged a viable substantive due process claim to the extent that the rent control ordinance deprived it of a "fair and reasonable" return on its investment by prohibiting rent increases designed to capture a return on investment in capital improvements:

> Under *Guaranty National* [*Ins. Co. v. Gates*, 916 F.2d 508 (9th Cir. 1990)], every dollar the landlord puts into the property by way of capital improvements constitutes an investment in the property for which a 'fair and reasonable' return must be allowed. Breaking even is not enough; the law must provide for a profit on one's investment. . . . To the extent plaintiff alleges that the rent increases allowed on account of capital improvements merely offset the cost of those improvements (or less), it has stated a claim for a violation of substantive due process under *Guaranty National*.

*Id.* at 958 (internal citations omitted).

[26] The Park Owners' claim fails because they have only

---

³¹Subsequent to a partial reversal by the Supreme Court on other grounds, we vacated a portion of *Sierra Lake*, but retained the portions relevant to this discussion. *See Sierra Lake Reserve v. City of Rocklin*, 987 F.2d 662, 663 (9th Cir. 1993).

brought a facial challenge to the RCO. A facial challenge to a law's constitutionality is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). "The fact that [a challenged law] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid . . . ." *Id*; *see also Keystone*, 480 U.S. at 493-95 (1987) (holding that, in a facial challenge, the issue is whether the "mere enactment of the [regulation] constitutes a taking").

**[27]** The Park Owners argue that the RCO necessarily denies them a just and reasonable return on their capital investments. This contention is belied by the text of the provision. Section 11A-5 provides that annual rent may be increased by 75 percent of the CPI (the "automatic increase"). The Park Owners, who are not satisfied with their RCO-prescribed rent increase may seek arbitration for more rent to cover actual expenses. Such rents are in addition to the automatic increase as a "just and reasonable return on investment." It is plain enough from this scheme that the RCO makes some allowance "for a profit on one's investment" and not "merely [an] offset [for] the cost of those improvements." *Sierra Lake*, 938 F.2d at 958. Although the RCO may not provide a full return on investment in every case, we are satisfied that the RCO provides for a reasonable profit in at least some circumstances. We recognize that there may be some imprecision between what the RCO will provide as a return and what the Park Owners might consider a reasonable return, but the Due Process Clause does not demand a perfect fit between the economic regulatory scheme and its purpose. *See Reno v. Flores*, 507 U.S. 292, 305 (1993) (holding that the Due Process clause demands no more than a "reasonable fit" between governmental purpose and the means chosen to advance that purpose); *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487-89 (1955); *Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1050-51

(9th Cir. 2000); *Carson Harbor Village*, 37 F.3d at 472; *Morseburg v. Balyon*, 621 F.2d 972, 979-80 (9th Cir. 1980). Because there are circumstances under which the law would be valid, the Park Owners' facial challenge must fail. *See Salerno*, 481 U.S. at 745.**[32]**

2

**[28]** The Park Owners also argue that the RCO violates due process because the provision provides no procedural "mechanism" by which they can file a grievance if they are not earning a just and reasonable return, such as a "discretionary application or provision." *See* RCO § 11A-5(i)(1) ("The arbitrator shall have no discretion to award additional amounts as a just and reasonable return on investment."). This argument, while creative, is an end-run around the Park Owners' previous argument. It fails for the same reason we rejected the prior claim. Although the RCO may lack a process for adjusting the reasonable rate of return similar to the arbitration process for adjusting the discretionary increase to cover operating costs and capital expenses, the absence of a process is only relevant when the Park Owners can demonstrate they have actually been denied a reasonable return. This claim must be addressed as an as-applied challenge, not a facial challenge.

As an alternative argument, the Park Owners attempt to ease the "uphill battle" they face on their facial challenge, *Keystone*, 480 U.S. at 495, by arguing that they should be excused from having to go through the hearing provisions set out in the RCO under the "futility doctrine." Under the futility

---

**[32]**Because the Park Owners' facial challenge fails we do not address whether the district court erred in holding that, as a threshold requirement to raise a "just and reasonable return" claim, the Park Owners must first prove that the government's actions were "arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *See Sierra Lake*, 938 F.2d at 957; *see also Fed. Power Comm'n v. Natural Gas Pipeline Co.*, 315 U.S. 575, 581-82, 585-86 (1942); *Guar. Nat'l Ins.*, 916 F.2d at 513 (9th Cir. 1990).

doctrine, a claimant may bypass the procedures for relief included in the challenged law if such procedures are shown to be "unvailable or inadequate." *Equity Lifestyle*, 548 F.3d at 1191 (quoting *Williamson*, 473 U.S. at 197).

**[29]** The futility exception applies only if the challenger has already attempted to use the state procedures "and has shown pursuit of such remedies would be futile." *Equity Lifestyle*, 548 F.3d at 1191. The record contains no evidence that the Park Owners have attempted to use the RCO procedures, much less proven them constitutionally inadequate. It would be mere speculation for us to accept the Park Owners' unsubstantiated claims that a request for a rent increase sufficient to secure a reasonable return would be denied. *See Yee*, 503 U.S. at 528 ("Because petitioners do not claim to have run that gauntlet, . . . this case provides no occasion to consider how the procedure has been applied to petitioners' property, and we accordingly confine ourselves to the face of the statute."); *see also Equity Lifestyle*, 548 F.3d at 1191.

V

**[30]** Finally, the Park Owners argue that the RCO violates the Equal Protection Clause because it singles out mobile home park owners, as opposed to other sorts of housing providers, to bear the burden of an affordable housing program. This argument is governed by our decision in *Equity Lifestyle*. In that case, we held that a mobile home rent control ordinance does not violate the Equal Protection Clause because it is rationally related to the legitimate public interest of promoting affordable housing. *Equity Lifestyle*, 548 F.3d at 1195. This is true even if the statute singles out mobile home park owners, does not increase the amount of available affordable housing, and "serve[s] the sole purpose of transferring the value of [the park owners'] property to a select private group of tenants." *Id*. at 1193.

## VI

**[31]** State and local governments have a legitimate interest in increasing the availability of affordable housing for their citizens. Translating that interest into effective public policy, however, has proven difficult. The Supreme Court and our court have addressed regulations like the City's RCO with some regularity; we have consistently questioned their ineffectiveness at increasing the availability of affordable housing, and we have commented on their pernicious side effects. *See, e.g.*, *Yee*, 503 U.S. at 530; *Sierra Lake*, 938 F.2d at 953-55; *Carson Harbor Village*, 37 F.3d at 472-73; *cf. Richardson*, 124 F.3d 1150 (reviewing a condominium rent control ordinance with similar effects). Nevertheless, so long as these rent control ordinances are "*designed* to accomplish an objective within the government's police power, and if a rational relationship existed between the provisions and the purpose of the ordinances," the Constitution affords state and local governments the flexibility to experiment to find a workable approach to the problem. *Carson Harbor Village*, 37 F.3d at 472. We therefore affirm the district court's findings that the City's RCO does not, on its face, violate the Due Process Clause or the Equal Protection Clause.

When such ordinances "go[ ] too far," however, and require some property owners to support policies that "in all fairness and justice, should be borne by the public as a whole," the Constitution requires that the government provide just compensation. *Lingle*, 544 U.S. at 537 (citation omitted). The *Williamson* prudential ripeness requirements have, for the most part, forced us to close the courthouse door to aggrieved property owners like the Park Owners, and to close our eyes to the extreme effects of laws like the City's RCO. The Park Owners, however, have managed to pry these doors open a bit by developing their case through three rounds of litigation in state and federal court, and the City has forfeited any objection that the case is not fit for review. We will not, therefore, throw these property owners back out and slam the court-

house door shut behind them. Today, our eyes are open. We have weighed the *Penn Central* factors, and we find that the RCO has effected a regulatory taking. Just compensation is due.

**[32]** We therefore reverse the district court's judgment on the takings claim and remand to the district court for further proceedings. On remand, the district court may of course consider any materials presented by either party that are relevant to determining the total amount of just compensation due to the Park Owners. *See, e.g.*, *Cienega Gardens*, 331 F.3d at 1354. As noted in Part III.A.1, the district court here did not consider the detailed figures included in either of the expert reports presented before it, possibly because it found that such evidence was precluded under a facial takings challenge under *Penn Central*. We have now held that a facial challenge under *Penn Central* exists as a viable legal claim, *see supra* pp. 13839-40, and affirmed that this court's precedents and the nature of a takings inquiry allow for some evidence outside the text of the statute to be admissible. *Id.* at 13840-43. The district court may therefore properly consider such "detailed figures," in addition to any other evidence it deems relevant, in conducting its analysis to ascertain the precise amount of just compensation owed to the Park Owners. *See, e.g.*, *Richardson*, 124 F.3d at 1154 n.2 (noting that an example using exact dollar amounts is "illustrative" of the economic impact of the regulation in a facial challenge).

Costs shall be awarded to the Appellants.

AFFIRMED in part, REVERSED in part, and REMANDED.

---

KLEINFELD, Circuit Judge, dissenting:

I respectfully dissent.

I agree with the majority that the prudential ripeness requirement of *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*[1] does not preclude a decision on the merits, and I agree with the majority that the rent control ordinance would amount to a regulatory taking under *Penn Central Transportation Co. v. New York City*,[2] were it not a re-enactment of one already in effect when the Guggenheims purchased the trailer park. But I cannot agree that there was a taking of anything for which the Guggenheims would be entitled to compensation, because they purchased the park after the regulatory takings that mattered.

The challenged rent control ordinance was first passed by Santa Barbara County (the "County") in 1979, and revised in 1987. The Guggenheims bought the trailer park in 1997, which was, at the time, located in an unincorporated part of the County. When the Guggenheims bought the trailer park, the County had long since taken away much of the rising value of the fee from the landlord and given it to the tenants who then owned trailers at the park. By 1997 the purchase price of the trailer park reflected the lower value of the trailer park to the landlord under the ordinance.[3] All the Guggenheims paid for was a trailer park burdened by the rent control ordinance. And when they bought, the statute of limitations had long since run on any takings claims arising from the County's 1979 and 1987 rent control ordinances.

The parties have stipulated that there was a short period during the day of February 1, 2002 — the day the City of Goleta (the "City") was incorporated — when the County rent control ordinance did not apply. Later that same day, pursuant to California statute, the City re-adopted the rent control ordinance.[4] Accordingly, the Guggenheims' lawsuit is not barred

---

[1] 473 U.S. 172 (1985).

[2] 438 U.S. 104 (1978).

[3] Majority op. at 13850-51.

[4] California code requires a newly incorporated city to adopt "prior to performing any other official act, [ ] an ordinance providing that all county

by the statute of limitations because they challenge the City's adoption, as part of its incorporation, of the County rent control ordinance, which followed the brief period when the ordinance was not in effect. Because the ordinance amounts to a regulatory taking, and not a physical taking,[5] the Guggenheims' challenge must be analyzed as regulatory taking.

We disagree on how to apply the controlling Supreme Court decision, *Palazzolo v. Rhode Island*.[6] In that case, a single shareholder owned a corporation that held land burdened by regulations.[7] When the corporation was dissolved, title to the burdened land passed to the sole shareholder by operation of law.[8] The government claimed that because the sole shareholder, the plaintiff, did not own the land when its use was restricted, he had no claim for compensation on account of any taking that had occurred when his corporation held title.[9] In this factual circumstance, the Court held that the plaintiff could pursue a claim for compensation, 5 to 4. Five justices wrote for the Court that a regulatory takings claim "is not barred by the mere fact that title was acquired after the effective date of the state-imposed restriction."[10] Justice O'Connor's concurrence states that the claim was not barred in the circumstances presented in that case.[11] Her stated rule

---

ordinances previously applicable shall remain in full force and effect as city ordinances for a period of 120 days after incorporation, or until the city council has enacted ordinances superseding the county ordinances, whichever occurs first." Cal. Gov't Code § 57376. The City did this on February 1, 2002. On April 22, 2002, the City re-adopted the entire County Code, including the rent control ordinance, for an indefinite period, subject to the City's power to amend, repeal, or modify the Code.

[5]*Yee v. City of Escondido*, 503 U.S. 519 (1992).

[6]533 U.S. 606 (2001).

[7]*Id.* at 613-14.

[8]*Id.* at 614.

[9]*Id.* at 616.

[10]*Id.* at 630.

[11]*Id.* at 635-36 (O'Connor, J., concurring).

rejects treating a change of ownership before or after the enactment of the regulation as *per se* barring or not barring a takings claim.[12] Instead, courts "must attend to those circumstances which are probative of what fairness requires in a given case."[13] The four dissenters and Justice O'Connor agreed that acquiring title after the taking could bar a takings claim.[14]

In *Palazzolo*, the transfer of title (by operation of law) had no effect on the wealth of the plaintiff. He merely gained personal title to what he previously owned as 100% shareholder of the corporation which held title.[15] By contrast, in this case, the Guggenheims bought the trailer park at a price presumably reflecting the impact of the rent control on the prior owners, a price lower than what they would have had to pay without the rent control ordinance. The Guggenheims purchased at arms length a trailer park already devalued by rent control. The land in *Palazzolo* was devalued by the challenged regulations while the plaintiff owned the impacted economic interest as a 100% shareholder in the corporation holding the land.[16]

We have two decisions on point. *Daniel v. County of Santa Barbara* holds that although *Palazzolo* rejects a rule that a purchaser who is aware of existing land-use regulations may never pursue a takings claim, it "did not adopt the converse of that rule," that the successor could always recover.[17] *Daniel* distinguishes *Palazzolo* on two grounds. One is that *Palazzolo* was a regulatory taking (as is the case at bar), while *Daniel*

---

[12]*Id.* at 633, 636.

[13]*Id.* at 635.

[14]*Id.* at 641 (Stevens, J., concurring in part and dissenting in part); *id.* at 654 n.3 (Ginsburg, J., dissenting); *id.* at 654-55 (Breyer, J., dissenting).

[15]*Id.* at 614 (majority opinion).

[16]*Id.*

[17]288 F.3d 375, 384 (9th Cir. 2002).

was a physical taking.[18] The second is that "the full value of the [taking] had already been taken from the Daniels' predecessors, it took nothing of value from the Daniels."[19] This second ground applies to the case at bar.

*Equity Lifestyle Properties, Inc. v. County of San Luis Obispo* involved another trailer park rent control ordinance.[20] Our decision in that case discusses, but explicitly declines to decide whether a plaintiff who had purchased after the ordinance went into effect had a claim under *Palazzolo*.[21] Instead, it rejects the takings claim as barred by the statute of limitations.[22] Since the takings claim failed on an another ground, *Equity Lifestyle* did not need to distinguish *Daniel*.

Our case fits the second *Daniel* distinction from *Palazzolo*, "[b]ecause the full value of the [taking] had already been taken from the Daniels' predecessors, it took nothing of value from the Daniels."[23] It also fits the limitation Justice O'Connor imposed in *Palazzolo*. Her opinion, and *Daniel*, would both have us "attend to those circumstances which are probative of what fairness requires in a given case."[24] Since the Guggenheims benefitted from a lower purchase price reflecting the burden of the rent control ordinance when they bought the trailer park, fairness does not require that they be compensated. Taking from Peter does not require giving compensation to Paul.

If this were a new rent control ordinance and a previous owner had transferred the trailer park to the Guggenheims

---

[18]*Id.*

[19]*Id.*

[20]548 F.3d 1184 (9th Cir. 2008).

[21]*Id.* at 1190 n.11.

[22]*Id.* at 1193 & n.15.

[23]*Daniel*, 288 F.3d at 384.

[24]*Palazzolo*, 533 U.S. at 635 (O'Connor, J., concurring).

before the statute of limitations had barred the seller's claim, then this might be an actionable case. But it is not. The naked wealth transfer was in the 1970's. The 2002 re-adoption was merely a ministerial re-enactment that did not transfer wealth from the Guggenheims.

Or, if there had been a substantial period of time, instead of less than one day, when the rent control ordinance had not been in effect, and if the Guggenheims had bought at a price reflecting freedom to charge market rents, they might have suffered an impairment of their investment-backed expectations or a negative economic impact.[25] But that is a hypothetical circumstance neither argued nor, on the facts of this case, arguable. There is nothing in the record to support the notion that the Guggenheims' interest in the trailer park was worth more before than after the City reenacted the County ordinance.[26] The reenactment had no economic impact on the Guggenheims.[27]

The Guggenheims cannot demonstrate any investment backed expectations that were harmed by the 2002 reenactment of the ordinance unless they breathe life into the takings claims that prior owners never brought. When the prior owners let the statute of limitations run without challenging the 1970's ordinance and the 1987 reenactment, their claim expired. *Palazzolo* does not undermine the rule that "a takings claim must [ ] comply with timeliness requirements."[28] The time-barred claims could not establish investment backed expectations. *Palazzolo* does not suggest that a transfer of title revives dead claims. Instead, *Palazzolo* holds that transfer of title will not necessarily bar a takings claim, a quite different

---

[25]*See supra* note 4 and accompanying text.

[26]*Garneau v. City of Seattle*, 147 F.3d 802, 807-08 (9th Cir. 1998).

[27]*See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538-39 (2005) (quoting *Penn Central*, 438 U.S. at 124).

[28]*Equity Lifestyle Props., Inc. v. County of San Luis Obispo*, 548 F.3d 1184, 1190 (9th Cir. 2008).

proposition. In one case, there is no longer a claim and in the other, there is a claim that has changed hands.

The Guggenheims purchase of the trailer park in 1997 did not breathe life into the dry bones of the takings claim that had died years before.[29] As the majority opinion concedes, the Guggenheims "got exactly what they bargained for when they purchased the Park—a mobile-home park subject to a detailed rent control ordinance."[30] The City took nothing from what they bought.

The third factor analyzed by the majority, the "character of the government action,"[31] is a continuation of the old ordinance, the same one that applied when the Guggenheims bought the trailer park. The brief gap and readoption did not reapportion public burdens, as did the 1987 and 1979 ordinances.[32]

Because the rent control ordinance did not harm the Guggenheims, they do not have a regulatory takings claim under *Penn Central Transportation Co. v. New York City*,[33] or the test Justice O'Connor set forth in *Palazzolo*, which forces us to consider "what fairness requires in a given case."[34] Fairness cuts the other way.

Unfairness arises in this case in quite another quarter because of the market distortions created by the rent control ordinance during the years after its enactment in 1979. As the majority explains, the rent control ordinance has had the effect of raising the average price of a trailer in the park by

---

[29]*Ezekiel* 37:1-14 (King James).

[30]*See Lingle*, 544 U.S. at 539 (quoting *Penn Central*, 438 U.S. at 124).

[31]*Id.* (quoting *Penn Central*, 438 U.S. at 124).

[32]*Armstrong v. United States*, 364 U.S. 40, 49 (1960)

[33]438 U.S. 104 (1978).

[34]*Palazzolo*, 533 U.S. at 635 (O'Connor, J., concurring).

$105,054, 88% of the sale price.[35] But for the rent control ordinance, the average trailer would be worth only $14,037. The people who really do have investment backed expectations in this circumstance are those who have bought trailers since rent control went into effect. Tenants come and go, and even though rent control transfers wealth to "the tenants," after a while, it is likely to affect different tenants from those who benefitted from the transfer. The present tenants lost nothing on account of the City's reinstitution of the County ordinance. But they would lose, on average, over $100,000 each, if the rent control ordinance were repealed. They have no legal protection against repeal, and have invested, essentially, in reliance on the stability of government decisions that create market distortions.[36] Repeal would not amount to a taking, but continuation of the ordinance deprives no one, not the plaintiffs and not the tenants, of any compensable value.

---

[35]Majority Op. at 13837 n.11.

[36]*Madera Irrigation Dist. v. Hancock*, 985 F.2d 1397, 1403 (9th Cir. 1993) (holding that "[r]easonable expectations arising out of past policy but without a basis in cognizable property rights may be honored by prudent politicians, because to do otherwise might be unfair, or because volatility in government policy will reduce its effectiveness in inducing long term changes in behavior. But violation of such expectations cannot give rise to a Fifth Amendment claim."); *see also Nat'l Union Fire Ins. v. United States*, 115 F.3d 1415, 1422 (9th Cir. 1997); *Peterson v. U.S. Dep't of Interior*, 899 F.2d 799, 812-13 (9th Cir. 1990).